MARY R. FIELD, Appellant, v. SOUTHERN SURETY COMPANY OF NEW YORK, Appellee.

No. 40771.

MARCH 17, 1931.

*Judson E. Piper* and *Harold S. Thomas*, for appellant.

*Parrish, Cohen, Guthrie & Watters* and *Stuart Ball* for appellee.

WAGNER, J.—The policy upon which suit is brought is denominated "Special Automobile Accident Policy." *It insures the plaintiff's husband, George A. Field, against* "the effects re-  sulting exclusively of all other causes from bodily injury sustained by the insured during the life of this policy solely through external, violent and accidental means (excluding suicide while sane or insane, or any attempt thereat, *while sane or insane) and which bodily injury is sustained by the insured while driving, riding* in or on, demonstrating, adjusting or cranking an automobile, or in consequence of being struck, run down or run over by an automobile or caused by the burning or explosion of an automobile."

The policy also contains the following provision:

"Further, this insurance does not cover * * * injuries fatal or non-fatal, except drowning, of which there shall be no visible mark or contusion on exterior of the body at the point of injury, the body itself in case of death not to be deemed such."

The plaintiff, in her petition, alleges that:

"On or about January 8, 1930, while said policy of insurance was in force and effect, the insured, George A. Field, met his death at Des Moines, Iowa, as a result of violent, external and accidental means, as provided and defined in said policy of insurance."

This petition was attacked by the defendant by motion for more specific statement, asking that the plaintiff be required to state in what particular way referred to in the policy it is claimed that the insured met his death; and, upon the sustaining of said motion by the court, the plaintiff, by amendment, alleged that:

"The death of said George A. Field resulted from bodily

injuries sustained by him while driving an automobile at the time and place as alleged in plaintiff's petition. And plaintiff further alleges that said death resulted from bodily injuries sustained by said assured, by reason of the explosion or explosions of an automobile.''

At the close of plaintiff's evidence, the plaintiff filed an amendment, alleged to conform to the proof, and stating that:

''The deceased, George A. Field, came to his death in consequence of adjusting an automobile, as provided for and within the meaning of said policy of insurance.''

The answer of the defendant company admits the issuance of the policy, and that the plaintiff is the beneficiary therein, and denies that the death of the insured was caused by any of the acts charged in the petition as amended; and further pleaded that there was no liability, because there was no visible mark or contusion on the exterior of the body at the place of injury.

It thus appears that the issues, as between the litigants, are clearly and distinctly stated. The policy, which is the contract between the insured and the first company, for whose obligations the defendant company is liable, insures the said George A. Field against the effects resulting, exclusively of all other causes, from bodily injury sustained by the insured through external, violent, and accidental means, ''which bodily injury is sustained by the insured while *driving* * * * or *adjusting* * * * *an automobile* *.* * or caused by the burning or *explosion* of an automobile.'' It will be noted that it is alleged by the plaintiff, and denied by the defendant, that the death resulted from bodily injuries sustained by the insured while *driving* an automobile. It is also alleged by the plaintiff, and denied by the defendant, that the death resulted from bodily injuries sustained by the insured while *adjusting* an automobile. It is further alleged by the plaintiff, and denied by the defendant, that the death of the insured resulted from bodily injuries sustained by reason of the *explosion* of an automobile. At the close of plaintiff's evidence, the court sustained a motion for a directed verdict in favor of the defendant, which presents the question as to whether or not there is evidence from which the jury could properly be allowed to find that the death of the insured resulted from injuries suffered by him while *driving or*

*adjusting* an automobile, or in consequence of an *explosion* of an automobile.

Before adverting to the evidence in the case, we deem it advisable to state the rules of law applicable to the construction of insurance policies. The general rule is that a policy of insurance must be construed most favorably to the insured, but this rule applies only when there is a real ambiguity in the language of the policy. If the words used in the policy are plain and unambiguous, it is the duty of the court to give effect to such language in accordance with its plain and ordinary meaning, and not make a new contract for the parties by arbitrary judicial construction. See *Walters v. Mutual Ben. H. & Acc. Assn.*, 208 Iowa 894; *Hiatt v. Travelers Ins. Co.*, 197 Iowa 153; *Jones v. Hawkeye C. M. Assn.*, 184 Iowa 1299; *Riser v. Federal Life Ins. Co.*, 207 Iowa 1101. In *Walters v. Mutual Ben. H. & Acc. Assn.*, 208 Iowa 894, we said:

"In placing an interpretation upon an insurance contract, it is well settled that, if its terms are ambiguous, that construction will be given it which is most favorable to the insured. On the other hand, this rule does not warrant an arbitrary judicial construction."

In said case, we quoted approvingly from *Laventhal v. Fidelity & Cas. Co.*, 9 Cal. App. 275, the following:

"The policy is but a contract, and, like all other contracts, it must be construed from the language used. When the terms are plain and unambiguous, it is the duty of courts to hold the parties to such contract. * * * It [the defendant company] made its insurance policy with these conditions, and evidently fixed its rate or premium in accordance with the risk it assumed. To these conditions the plaintiff gave his assent when he accepted the policy."

In *Hiatt v. Travelers Ins. Co.*, 197 Iowa 153, we declared:

"If the language is, without violence, susceptible of two interpretations, that one which will sustain his claim and cover the loss must, in preference, be adopted over that construction which will prove fatal thereto. Such a rule, however, does not warrant an arbitrary judicial construction of the terms of the instrument,

and a court is in duty bound to give effect to exceptions and limitations in a policy as they are written; and unless it may be said there is ambiguity in the words found in the policy, there is no occasion for the exercise of choice of interpretation. *Jones v. Hawkeye C. M. Assn.*, 184 Iowa 1299. In the absence of some controlling statutory rule to the contrary, a court must give effect to the language of an insurance policy according to the plain and ordinary meaning of the terms which the parties have employed. *Swanson v. Provident Ins. Co.*, 194 Iowa 7. It is not the function of a court to make a new contract of insurance by reason of supposed considerations of expediency or fairness. Some doubt or ambiguity must exist, in order to invoke a rule of construction or interpretation.''

With the foregoing rules for our guidance, we now turn to the evidence in the case, to ascertain whether there is evidence from which the jury could properly be allowed to find that the death of the insured resulted from injuries suffered by him while driving or adjusting an automobile, or in consequence of an explosion of an automobile. If there be no such evidence, then the ruling of the court in sustaining defendant's motion for a directed verdict must be upheld. The insured was a lumber jobber, and, at the time of his death, on January 8, 1930, resided with his family at the southeast corner of Thirty-ninth Street and Ingersoll Avenue, in the city of Des Moines. He was the owner of a Ford coupé, which he used in connection with his business. He was also the owner of a Paige sedan, which was not used in connection with the insured's business, but was used as a family car, principally by the daughter, in going back and forth from the residence to the high school. On Sunday evening, January 5th, Mr. Field and his family rode out to dinner in the Paige sedan, during which trip the tank was filled with ethyl gas. The weather was mild, and there was no alcohol or anti-freeze solution in the radiator, and the evidence tends to establish that the insured knew this condition. The residence of the insured faces west on Thirty-ninth Street, and there is a garage, large enough to hold only two cars, situated in the southeast corner of the lot. The next neighbor to the south, Callahan, has a garage which is situated on the northeast corner of his lot, and which is also large enough to contain only two cars. There is a driveway leading from the street to said two garages, the entrance being used in

common by the two neighbors; but a short distance from the street, the driveway to the Field garage veers to the left around two trees, and then to the right, to reach the garage, while the driveway to the Callahan garage turns slightly to the right. There is a walk from the front of the Field residence, running directly south to the private driveway used in getting to the Field garage. At the west of the Field garage are four swinging doors, all of which swing outward, and the two middle doors are adjacent to each other. In order to place a car in the north side of the garage, the two doors farthest north must be opened; and the same is true as to the two doors farthest south, in order to place a car in the south side of the garage. On Tuesday evening, January 7th, the daughter used the Paige automobile, and left it standing in the driveway at the south end of the walk hereinbefore mentioned. It was impossible to drive around said automobile with another automobile and arrive at the Field garage. Mrs. Field and her daughter retired about 11:30 P.M. There is an electric light in the garage, and also one at the southeast corner of the Field residence, which were turned on by Mrs. Field before retiring. The neighbor, Callahan, came home in his automobile about 12:30 A.M., at which time the Paige sedan was standing in the Field driveway, as hereinbefore stated. Callahan left his car in his driveway near his garage, and when it was thus located, it was impossible to drive a car around his car and get to the Field garage. On the morning of January 7th, Field went from Des Moines to Sigourney on a business mission. Mrs. Field was not sure whether he would return that night, but she expected him. The neighbor, Callahan, arose before 5 A.M. on January 8th, and entered his car at the place where he left it standing a few hours before, turned to the left, passing within about 15 feet of the Field garage, and then drove down the Field driveway to the street. At this time, the Paige automobile was not in the driveway where it had been when he came home about 12:30. When Callahan came home, at 12:30 A.M.; he observed the lights on the Field premises, hereinbefore mentioned, but did not observe whether the doors to the Field garage were open or closed. When he left, early the next morning, the doors of the Field garage were closed, and the lights still burning. Upon his leaving, he did not hear a motor running in the Field garage. The temperature grew colder during the night of January 7th, it

being as low as seven degrees above zero. About 7:15 on the morning of January 8th, Mrs. Field discovered that the Paige car was not in the driveway, where it had been left the evening before. She walked down the walk to the driveway, and saw the electric lights burning, and heard the motor of a car in the garage. The doors to the garage were closed. She made her entrance at one or both of the two doors farthest north, and in the garage found the lifeless body of her husband. Both the Paige car and the Ford coupé were in the garage, the coupé being to the south of the Paige, and a space of about three feet between them. The motor of the Paige car was running, while that of the Ford car was not in operation. The right front door of the Paige car was standing open; the doors of the Ford coupé were closed. The body of Mr. Field lay, face upward, on the left fender and running board of the Ford coupé, with his feet resting upon the ground, and his head between the fender and the back end of the hood. His body was fully clothed, with overcoat, galoshes, and gloves. His hat was tipped or thrown back; his portfolio was lying at his feet. Mrs. Field called at the house of the neighbor to the south for help, and a Mr. Moser came to her relief. He carried the body from the garage to the driveway. Mr. Moser detected the odor of smoke and gas that comes from the exhaust pipe of a car, and saw the smoke coming from the exhaust pipe of the Paige car, and turned off the motor. An autopsy was performed upon the body in the afternoon of January 8th, and it disclosed that death was due to carbon monoxide poisoning, caused by inhalation of carbon monoxide gas. There were no marks of violence anywhere on the body. Peculiar pinkish blotches were found upon the surface of both legs, and a strikingly red color of the musculature of the body. The medical testimony is:

"It was a discoloration to the extent that it wasn't the normal color, being a brighter red than normal, and the blotches on the legs were also abnormal. This occurs in this type of poisoning. The blotches referred to are due to the dilation of the capillaries. Q. At the point of injury on the inside? A. No, it is the capillaries, the small blood vessels, that were dilated enough so that this high-colored blood shines through."

The foregoing constitutes substantially all of the material and relevant testimony in the case. Does it show that the death of

the insured resulted from an injury sustained by him "while driving an automobile?" We answer in the negative. See *Eynon v. Continental Life Ins. Co. of Missouri* (Mich.), 233 N. W. 228; *Howell v. J. Mandelbaum & Sons,* 160 Iowa 119; *City of Harlan v. Kraschel,* 164 Iowa 667. There is nothing ambiguous in the use of the word "driving," as used in the policy; there is nothing to show that said word is used in a technical sense, or that it should be given a meaning other than its usual and ordinary meaning. "Drive" is defined by Funk & Wagnall's New Standard Dictionary as "to urge forward under guidance; compel to go in a particular direction." It is also defined by the Oxford Dictionary as "urge onward and direct the course of (an animal drawing a vehicle or plough or the vehicle itself; also, by later extension, a railway engine or train, etc.)" In *Howell v. J. Mandelbaum & Sons,* 160 Iowa 119, at 122, we said:

"According to the lexicographers, 'drive' means to compel or urge to move in some manner or direction."

This is its ordinary meaning. In *Eynon v. Continental Life Ins. Co. of Missouri* (Mich.), 233 N. W. 228, there was involved an insurance policy which dealt with the insuring phrase, "sustained * * * by the wrecking or disablement of any private automobile, * * * in which the insured is riding or driving." The court said:

"Mr. Eynon drove his automobile to a gasoline filling station in Bay City to inflate a tire. He stopped his automobile at the street curb, stepped to the ground, and applied the air to the disabled tube, and an explosion followed, causing the outer rim and tube to fly from the wheel and strike his face and body, inflicting injuries from which he died within a few hours. * * * *The insured was not riding in or driving his car* * * * [writer's italics]. Much ingenuity is exhibited by counsel in an endeavor to bring the accident within the policy, but it all falls before a reading of the plain words employed, limiting liability to accidents happening in a specified manner * * *. The language is too plain to call for construction, and bars separation of words therein from the context."

The appellant's theory must be, and in fact is, that the insured drove the Paige car into the garage and left the motor

running, and then drove the Ford coupé into the garage alongside of the Paige car. She argues:

"He [Field] most certainly started the motor of the Paige car and drove it into the garage. There can be no question that he was then driving the Paige automobile. Can it be said that his driving ended when he alighted from the Paige and went back to the Ford car, intending to return to the Paige? * * * The undeniable inference is that he left it running, was thereby controlling the motive power, and was in the act of completing the driving of the Paige car he was engaged in,—that is, by shutting it off,—when he met his untimely death."

There is no evidence as to what was Field's intent in letting the motor of the Paige car run, or as to whether it was intentional or unintentional. The evidence is circumstantial, and as to this  matter it is merely speculative and conjectural. Verdicts may not be based on mere surmise or conjecture. The circumstantial evidence must be something more than consistent with appellant's theory as to how the accident occurred. It must exclude every other reasonable hypothesis. See *Wheelan v. Chicago, M. & St. P. R. Co.*, 85 Iowa 167; *Neal v. Chicago, R. I. & P. R. Co.*, 129 Iowa 5; *Hall v. Chicago, R. I. & P. R. Co.*, 199 Iowa 607; *Cotten v. Halverson*, 201 Iowa 636; *Schmidt v. Hayden*, 205 Iowa 1369; *Asbach v. Chicago, B. & Q. R. Co.*, 74 Iowa 248. If his letting the motor of the Paige car run was unintentional,—a lapse of memory,—then he certainly was not driving the Paige car. If, on the other hand, his letting the motor run while he drove the Ford car into the garage, was intentional on his part, then he was not driving the Paige car. According to appellant's theory, if, by merely letting the motor of the Paige car run while he drove the Ford car into the garage, he was still driving the Paige car, then he was driving both cars at the same instant of time. This constitutes an absurdity. He could not have been driving the Paige car while driving the Ford car. The driver drove both cars to their destination. He had ceased driving the Paige car when he began driving the Ford car. He had driven the Ford car to its destination, had alighted, and had removed his portfolio therefrom, and the door was closed. His driving of both cars was at an end.

The appellant cites *Grant v. Chicago, M. & St. P. R. Co.*, 78

Mont. 97 (252 Pac. 382), and *Commonwealth v. Crowninshield*, 187 Mass. 221 (72 N. E. 963), in support of the proposition that a person in control of the motive power of a motor vehicle is driving the same; but in both of said cited cases the automobile was in motion at the time in question.

In the *Grant* case, the question was as to whether or not the negligence of the driver was imputed to a passenger. Said cases are not authority for appellant's contention in the instant case. The appellant strongly relies upon *Southern Sur. Co. v. Davidson* (Tex. Civ. App.), 280 S. W. 336, wherein it is held that a policy covering an accidental injury while operating an automobile covers an injury received to the ankle while alighting therefrom. Said case merely holds that the operator is protected in doing the necessary act of leaving the conveyance, and until he has safely landed upon the ground. This case is not applicable to the facts in the instant case; for, as we have seen, even under appellant's theory, Field had safely landed. The appellant further relies on *Jaquith v. Worden*, 73 Wash. 349 (132 Pac. 33). In this case a statute requiring lights on automobiles "when driven on any public road" was construed. The court held that parking without lights was a violation of the statute, saying: "An automobile does not cease to be 'driven' when stopped or left standing on a public highway during the hours of darkness." In *City of Harlan v. Kraschel*, 164 Iowa 667, we held to the contrary, saying that "a standing car is not, in the ordinary sense, being 'operated or driven.'" Also, see *Griffin v. McNeil*, 198 Iowa 1359; and *Leete v. Hays*, 211 Iowa 379. The appellant also relies on *State v. Webb*, 202 Iowa 633; *State v. Overbay*, 201 Iowa 758; *State v. Myers*, 207 Iowa 555. These cases relate to the statute making it a crime to operate a motor vehicle while in an intoxicated condition. It will be noted from the statute, Section 5027, Code, 1927, that the verb in the statute is "operates," and not "drives." It is manifest that the word "operate" cannot, in any event, in all cases, be equivalent to or synonymous with the word "drive." Many machines are stationary, and while they can be and are operated, they cannot be driven. In *State v. Myers*, 207 Iowa 555, we merely held that the owner of an automobile riding in a moving car with another who was intoxicated and at the wheel is an accomplice in the criminal act of operating the car while in an intoxicated condition. In *State v.*

*Overbay,* 201 Iowa 758, we held that, within the meaning of the criminal statute, the operation of the engine by a drunken man at the wheel in an attempt to get the car out of a ditch or hole in the road constituted the operation of an automobile while in an intoxicated condition. And in *State v. Webb,* 202 Iowa 633, we held that the stepping on the starter and the running of the motor by an intoxicated man are sufficient to constitute the operation of an automobile while in an intoxicated condition. It will be observed, as hereinbefore stated, that the criminal statute uses the word "operates," instead of "drives." It will also be observed that, in the *Myers* case, the car was in motion, and in the *Webb* and *Overbay* cases, the one convicted was in the automobile, putting forth his efforts in an endeavor to set the car in motion. Even if we should hold that the words "operate" and "drive" are synonymous terms, the one convicted in each case was driving the automobile, within the ordinary meaning of the word "drive," hereinbefore given; but said cases cannot be said to be analogous to the instant case. In the instant case, Field had driven the car to its destination, and had safely alighted therefrom. It will be observed that the appellant argues that Field was driving the Paige car, because she surmises that he intentionally let the motor run while he drove the Ford coupé into the garage. If he had intentionally let the motor run and had gone to the house and gone to bed, or if, under the same circumstances, he had gone to a café in close proximity, to buy a cigar, it could not be successfully asserted that he was driving the automobile while absent therefrom. Neither can it be under the facts as disclosed by the record. Whether, in any event, within the meaning of such a policy of insurance, one could be said to be driving a car which is not in motion, we need not and do not now determine. It is sufficient to say that, under the facts as shown by the record, a finding by the jury that Field sustained an injury while driving an automobile could not be upheld.

But the appellant contends that the evidence is sufficient to warrant a finding by the jury that Field, at the time in question, was adjusting an automobile, within the meaning of the policy. Neither do we agree with this contention. There is nothing ambiguous in the word "adjusting," as used in the policy, and nothing to show that said word is used in a technical sense, or that it should be given a meaning other than its usual and ordinary

meaning. "Adjust" means "to cause to fit; make exact; bring into such relative positions or relations as will make action harmonious or possible; as, to *adjust* the parts of a machine." Funk & Wagnall's New Standard Dictionary. In *Anderson v. Seropian*, 147 Cal. 201 (81 Pac. 521), in defining the word "adjust," as applied to the adjustment of a machine, the court said: "To 'adjust' is to 'place in order.'" This is the ordinary meaning of the word. There is no evidence that the automobile was not in order, and no evidence from which there could be a finding by the jury that, at the time in question, Field was "adjusting the automobile."

The appellant further contends that the jury could properly find from the evidence that the injury to Field was caused by "an explosion of an automobile." The term "explosion" may be  described in a general way as sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report (see *Vorse v. Jersey Plate Glass Ins. Co.*, 119 Iowa 555) ; or "sudden breaking apart, shattering, or bursting in pieces by internal pressure * * *." See Funk & Wagnall's New Standard Dictionary. The word "explosion" occurs in the wording of the policy as follows: "Caused by the burning or *explosion* of an automobile." It is proper to invoke the rule *noscitur a sociis,* —it is known from its associates or associations,—to ascertain the meaning of the word "explosion." See *Bader v. New Amsterdam Cas. Co.*, 102 Minn. 186 (112 N. W. 1065, 120 Am. St. 613) ; *Neal v. Clark*, 95 U. S. 704 (24 L. Ed. 586). In the latter case it is declared:

"It is a familiar rule in the interpretation of written instruments * * * that 'a passage will be best interpreted by reference to that which precedes and follows it.' So, also, 'the meaning of a word may be ascertained by reference to the meaning of words associated with it.'"

It is quite clear that the explosion referred to in the policy of insurance must be the "explosion of an automobile." While the mechanism of gasoline motors operates on the principle of explosion, the words "explosion of an automobile," as used in the policy, cannot and do not mean the internal explosion of the motor fuel which is necessary and sufficient to run the motor, as

claimed by the appellant. The explosion of the motor fuel is one thing, but the "explosion of an automobile" is quite another. There is great danger of an explosion when an automobile burns or catches fire. Without further discussion, it is quite apparent that a finding by the jury that Field's death was caused by an "explosion of an automobile" could not be upheld.

Thus far, in our discussion, we have found that a finding by the jury that the injury to Field was sustained "while driving an automobile," or "while adjusting an automobile," or that it was "caused by an explosion of an automobile," could not be upheld. Therefore, the action of the court in sustaining defendant's motion for a directed verdict was proper.

The appellee makes the further claim that the evidence shows that there is "no visible mark or contusion on exterior of the body at the point of injury;" but, in view of our conclusions on the foregoing propositions raised by the appellant, it becomes unnecessary for us to pass upon this proposition.

For the foregoing reasons, the judgment of the trial court is correct, and the same is hereby affirmed.—*Affirmed.*

FAVILLE, C. J., and STEVENS, ALBERT, and GRIMM, JJ., concur.