D. S. TWOGOOD, Appellee, v. AMERICAN FARMERS MUTUAL AUTOMOBILE INSURANCE ASSOCIATION, Appellant.

No. 45428.

1134

FEBRUARY 11, 1941.

Roseberry & Pitts, for appellee.

Putnam, Putnam, Fillmore & Putnam, for appellant.

BLISS, J.—In his petition, the plaintiff alleged the issuance of the policy upon his damaged car and that it was in full force and effect at the time of the injury. He alleged recoverable damages for injury to the car in the sum of $466.12. In count

No. 1 of its answer, defendant denied generally except as admitted or otherwise plead to. In count No. 2 of the answer, defendant alleged:

"By way of affirmative defense the defendant states:

"That by the terms of the policy of insurance issued to the plaintiff under the conditions thereof, it is provided:

" 'Exclusions—Unless otherwise provided by agreement in writing added hereto, the Association shall not be liable for loss or damage * * * (e) in connection with the perils of collision or upset only, while the automobile described herein is being operated by any person under the age limit fixed by law, or, in any event, under the age of fourteen years; or while being operated or manipulated by any person prohibited from driving, or unauthorized by law to drive an automobile; * * *.'

"That at the time of the accident referred to in the plaintiff's petition, this defendant is informed, believes and therefore alleges the fact to be that the automobile involved was either being operated by a person under the age limit fixed by law, or operated or manipulated by a person prohibited from driving, or unauthorized by law to drive an automobile within the meaning of the Exclusions and conditions of said policy quoted herein."

It was stipulated that the policy was issued to the plaintiff and that it was in full force and effect at the time of the accident on October 25, 1939, and that the required notice and proof of loss had been given. It was also conceded that the stipulation waived none of defendant's rights under the exclusion clause of the policy.

The facts, as taken from the abstracts, are as follows: The plaintiff, a man 67 years old, a licensed driver, a member of the board of supervisors of Plymouth county, Iowa, had roomed at the home of Mrs. Schneider in Hinton for ten years; on the day of the accident, he had come to the home about 4 o'clock in the afternoon, and was told that the cattle at the County Home were in the corn; he asked Patricia Schneider, the 16-year-old daughter of the home, to go with him; she got behind the steering wheel of the Dodge sedan, and plaintiff sat on the front seat

to her right; she had driven the car repeatedly with plaintiff's permission; and he testified that she had been a good driver; she had been driving for about two years; Patricia drove a mile west and a mile south of Hinton, over a hilly road, which was strange to her, at a speed of between 20 and 30 miles an hour; at that point, the north and south road intersected an east and west road; their route required a turn to the right and west on this intersecting road; this turn was apparently a sharp one, and was described by the plaintiff as a hairpin turn; it was on a short, rather steep rising grade which terminated at the east end of a wooden bridge, 48 feet long, about 16 feet wide, with wooden banisters along the sides; as the car approached the intersection, plaintiff said to Patricia, " 'Slow down here. This is an awful bad corner' "; she slowed the car to less than ten miles an hour, and before the car reached the turn, she asked the plaintiff if he didn't want to take the wheel; she had asked him that once before, and he told her, " 'All right; just go ahead and take it slow' "; the car was in high gear, and as the speed was reduced, the motor stopped and the car stalled just as it came on to the east end of the bridge, at about its center, with the front wheels of the car cramped to the right; Patricia set the hand emergency brake, the lever of which was to her left, and said to plaintiff, " 'You had better take it' "; he replied, " 'You're all right. You're just scared a little, I guess' "; plaintiff took hold of the wheel, and pushed her over a little ways so he could get a better hold of the wheel, but didn't exchange places with her; plaintiff said to her, " 'Start it up. Go ahead' "; she let go of the wheel and did not afterward take a hold of it; the gear shift was on the steering wheel; the ignition was at all times on; the clutch pedal and brake pedal, both operated by the foot, were side by side just under the wheel; the foot starter was to the right and forward of the other foot pedals; when plaintiff told her to "go ahead," she disengaged the clutch, shifted into low gear, stepped on the starter, released the emergency brake, engaged the clutch, stepped on the accelerator, and the car "lurched forward," "grabbed" the north railing, and went through it to the ditch below. When the car was started, the front wheels were still cramped to the

right and north. Plaintiff never turned the steering wheel. He did nothing after putting his hand on the wheel. He testified: "I, only, had my hand on the steering wheel. I hadn't turned it because I didn't realize it was turned to the north."

Plaintiff and Patricia were the only witnesses testifying as to how the accident occurred. Each testified for the plaintiff. They were bruised and shaken up considerably when the car fell from the bridge, and were taken to a Sioux City hospital. Two days later, and while plaintiff was in the hospital, a representative of the defendant interviewed him. He told the representative what had taken place, and the latter wrote it in substance, on the blank lines following printed questions on a blank proof-of-loss report. This report had been signed by plaintiff, and was identified by him, and introduced in evidence by defendant as a part of his cross-examination. It stated among other matters, not material here: "* * *. Full name of driver. Patricia Schneider. * * * Describe accident in detail: * * *. Patricia Schneider * * * was driving my car. * * * When Miss Schneider turned upon the bridge, she killed the engine. I took hold of the wheel. Miss Schneider stepped on the starter and started the car in motion. I do not know what happened after that. The car started in motion. I tried to turn the wheels but it crashed through the bridge and fell some 24 feet in a ditch below. It is possible that the girl driving may have accidentally stepped on the accelerator. Also, it may be possible that the front wheels locked."

It will be noted, that three times in the statement he refers to Patricia as the driver, or as driving the car. At that time, he apparently had no thought that she was not driving his car at the very time of the accident. The plaintiff, as a witness, did not dispute the correctness of the statement, nor attempt to change or correct it. When he read it from the witness chair, at the request of his attorney, he stated: "Well, that's pretty close to what I have testified to. He wasn't taking it down verbatim as I gave it to him. I explained to him how I had taken hold of the wheel, and directed her to start the car. I think he has that in there, doesn't he? He wrote it up after the conversation."

It was stipulated, as a part of the defense, that Patricia had no driver's, operator's or chauffeur's license, or permit or instruction permit to drive a car, and that no application for one had been made by her, or by anyone in her behalf. She was unquestionably "a person prohibited from driving, or unauthorized by law to drive an automobile."

If the statement signed by plaintiff be taken at its face value, it must be said, in our judgment, that the car was being "operated or manipulated" by Patricia Schneider, "a person prohibited from driving, or unauthorized by law to drive an automobile." The testimony of the two witnesses, though in greater detail, confirms the written statement of plaintiff that Patricia was driving the car. He appreciated that she was not quite sure of her driving ability in the situation confronting her. She had asked him twice before if he ought not do the driving. He tried to assure her that everything was all right, and that she was unnecessarily scared. He did not attempt to take over the operation of the car. He was merely assisting her. When the motor stopped and the car stalled, and she again said, "You had better take it," meaning clearly to drive the car, he did not do so, but taking hold of the wheel, he told her to "start it up" and "go ahead." He was simply going to help her over the temporary difficulty, and then they would be on their way, with Patricia continuing to drive the car, as she had been doing since they left her home.

Each party cites various definitions of the word "operate." It is a word with a definite general meaning, but is used to express many differing shades thereof. With reference to the use of a motor vehicle on the highway, paragraph 39 of the 1939 Code section 5000.01 defines an operator thereof as meaning "* * * every person, other than a chauffeur, who is in actual physical control of a motor vehicle upon a highway." This does not mean that one who has general authority over a driver with respect to the destination, route, or rate of speed of the vehicle, is operating the vehicle. Neither does it mean that one, who sits beside the one who is behind the wheel, and teaches or gives instruction to the latter with respect to driving, is the driver of the car. Code section 5013.06 authorizes the issuance

of an instruction permit to one who is to be accompanied by a licensed operator or chauffeur. The statute requires the latter to occupy a seat beside the "driver," the one who has physical control of the car. As stated in 5 Am. Jur. 790, the word "operate," as used in an automobile policy of this kind means "to have charge of it as the driver." Appellee asserts that "his was the dominating mind directing its operation." If it were true, under the record, it would not under sound principles or precedents avoid the provisions of the exclusionary clause. In Witherstine v. Employers' Liability Assurance Corporation, 235 N. Y. 168, 170, 172, 139 N. E. 229, 230, 28 A. L. R. 1298, an action like this one, the policy applied only to automobiles being operated by Charles Dunn. At the time of the accident, the car was being driven by another, and "Dunn was directing him when, where and how fast to drive the car." The court held that Dunn was not operating the car. Under the statutes of New York, the words "operate" and "drive" and their derivatives are used in general without distinction. The court, speaking through Justice Pound, with Justice Cardozo concurring, said:

"The word 'operate' is used throughout the statute as signifying a personal act in working the mechanism of the car. The driver operates the car for the owner, but the owner does not operate the car unless he drives it himself. * * * Obviously the word is used in the policy in the same sense in which it is used in the Highway Law."

With respect to such a claim of "domination," Appleman in his late work, "Automobile Liability Insurance," on page 179 thereof, said:

"It has been occasionally contended that in such a case as the above where the parent leaves control in the child's hands and does not interfere with the operation that if it be shown that the child is acting as his agent that the parent is then legally 'operating' through such agent. The object of such contention is to demonstrate that even if the driver is one prohibited by the policy terms, the named insured is, nevertheless, the operator, and may recover under the policy. This

rather attenuated theory has been ably upset by the New York court in the following language: 'Even if we should hold that the automobile was "operated" by the insured-owner because he was in it, was not his son also operating the automobile? He was behind the wheel, guiding the vehicle and manipulating its mechanism. If the owner was technically operating, the fourteen-year-old son was actually operating and driving, and the policy thereby forfeited.' '' Devitt v. Continental Casualty Co. (1934), 154 Misc. 603, 277 N. Y. S. 844.

In that case and in the Witherstine case, the owner did not guide the car. Neither did the appellee. He had his hand on the wheel but never attempted to turn it, or to guide the car. Everything that was done in the operation of the car was done by Patricia. She had control of and exercised control over every instrumentality of the car—starter, clutch, gear shift, brakes, accelerator—which had any connection with the power or speed of the car. Without her activity, the car would never have moved. She placed the car, and the front wheels of the car, in the very position which caused it to go off the bridge. The appellee did nothing.

Appellee relies upon Williams v. Nelson, 228 Mass. 191, 117 N. E. 189, Ann. Cas. 1918D, 538; O'Connell v. New Jersey Fidelity and Plate Glass Ins. Co., 201 App. Div. 117, 193 N. Y. S. 911, affirmed in 235 N. Y. 583, 139 N. E. 744; and Lumbermen's Mut. Cas. Co. v. McIver, 27 F. Supp. 702, affirmed in 110 F. 2d 323. The facts in these cases make the decisions inapplicable. In each of those cases, the elder person seized the steering wheel, and the emergency brake, and controlled the movement and speed of the car for some distance before injuring the third party. In the McIver case [27 F. Supp. 702, 705], the trial court found that the assured "was actually in physical control of the motor vehicle at the time of the impact." On appeal, the court could not disturb this finding of fact unless it was clearly wrong. In each of those cases, the injury was caused while the car was moving and under the control of the assured, and not the control of the unauthorized driver. In the O'Connell case, supra (193 N. Y. S. 911, 913), the court said: ''* * * the car was not going toward the man subsequently injured

until the grandfather took control of the car and purposely changed its course. Thereafter this occurred." Two of the five judges in the appellate division of the supreme court dissented. In the dissenting opinion (page 915), Justice Hinman said:

"The driving of a car requires more than guiding its course on the highway. It must be deemed to include the control of the motive power and the brakes. To control these, to be able to regulate the amount of power, to be able to connect and disconnect such power instantaneously, and to be able to retard or stop the car in any emergency by the application of brakes, is just as much a part of driving the car, in any fair acceptance of the term, as is the holding of the wheel.

"In my judgment, the control of the former is more essential to the avoidance of accident than the latter. The purpose and the natural meaning of the provision was to eliminate insurance against accident that might arise from the negligent management of any or all of these instruments which are utilized in the driving of a car. How can we say that the grandfather was driving this car? He was only in control of the direction which it took in its progress on the highway, and only imperfectly in the control of the wheel, because obviously his seat at the right of the wheel, instead of in back of it, was a disadvantageous one. He was not in control of the foot throttle, which regulated the flow of gas. He was not in control of the clutch, which disconnected the engine from the driving shaft. He was not in control of the service brake, which is the powerful brake of a car. His position was disadvantageous to control even the hand brake and at the same time to guide the wheel. The most that can be said is that the driving of the car was divided between the grandfather and his 14 year old granddaughter, for the reason that she released her hold on the wheel. Can a person be deemed any the less the driver of a car, within the meaning of the provision of the policy, by simply releasing the wheel to another? I am inclined to take the position that she cannot. I believe that comes within the risk that was not intended to be covered. The very thing which happened here is the thing which naturally would flow from permitting a child of

that age to sit in the driver's seat. In any emergency, an adult at her side would naturally grasp the wheel, and, not being in a position in such an emergency to exercise the best judgment, or to execute it from lack of ability to control all of the mechanism of the car, frequent accidents are likely to arise, which would not arise if a person of such age had not been permitted to occupy the driver's seat.

''I think it is too narrow a construction of the language used to hold that the person managing the wheel is driving the car. The proper interpretation of the clause in question is that the policy does not cover an accident which has been proximately caused by the driving of a car by a person under the age of 16 years. It seems to me that the proximate cause of this accident was the driving of the car by a girl of 14 years, and that the act of the grandfather must be considered as an act set in operation by the primary cause, namely, having permitted a girl of those years to drive the car. His act was merely a continuation of the original act, and the accident was the probable consequence of having permitted this girl to drive the car.''

In Howell v. Mandlebaum & Sons, 160 Iowa 119, 122, 140 N. W. 397, 398, Ann Cas. 1915D, 349, a balky horse started while the driver was at its head. The driver jumped on the wagon but did not seize the lines. The court held that ''One may drive a team with or without holding the lines * * *.'' Many times the driver of a car has asked the one sitting beside him to watch the wheel while he lit a cigar or cigarette. Oftentimes simply watching is sufficient, but the fact that he placed his hand on the wheel or steadied or turned it could hardly be said to make him the driver or operator of the car.

We have held that starting the motor of a car is operating it. State v. Webb, 202 Iowa 633, 210 N. W. 751, 49 A. L. R. 1389. We have also stated that ''though only one person can be engaged in the physical operation of a motor vehicle at one time,'' another may ''aid in the operation.'' State v. Myers, 207 Iowa 555, 556, 223 N. W. 166. A fair and reasonable conclusion from the entire record is that all the appellee intended to do was to ''aid in the operation of the car.''

Appellant also cites in support of its contentions, Feitelberg v. Matuson, 124 Misc. 595, 208 N. Y. S. 786; Morrow v. Asher, Tex., 55 F. 2d 365; O'Tier v. Sell, 252 N. Y. 400, 169 N. E. 624; State Farm Mut. Auto. Ins. Co. v. Coughran, 303 U. S. 485, 58 S. Ct. 670, 82 L. Ed. 970, reversing 92 F. 2d 239.

 Appellee contends for the general rule that a policy of insurance must be construed most favorably to the insured. This is true, but the rule applies only when there is a real ambiguity in the language of the policy. The meaning of the clause under consideration is clear and the intendment of the parties to the contract is plain. There is no room for judicial construction. Field v. Southern Surety Co., 211 Iowa 1239, 1242, 235 N. W. 571, 572.

He also argues: ''As illustrated in this case, the term 'insurance' is a misnomer. Too often today, when a company sells and an assured buys 'insurance,' he wakes up and finds he is only buying a lawsuit.'' This is hardly a fair argument under the record. Appellee had this policy for about five years. It would not be a far-fetched assumption that he knew of this provision in it. But notwithstanding, he made a practice of permitting this unlicensed, unauthorized minor (Code section 5013.01) to drive his car upon the highways, contrary to the statutes, and contrary to the rules of fair treatment to the travelling public. He was guilty of a misdemeanor if he knowingly did so (Code sections 5015.05 and 5036.01). By his conduct he exposed himself to the damage which he asks the appellant to pay.

 There is no dispute in the facts, and no question for the jury to pass upon. All of the testimony of the only persons who have any knowledge of the facts is before us. Under these established facts, it is our judgment that the appellant was exempted from liability to the appellee under the contract. A new trial could not within reason change the fact situation. The motion of the appellant for a directed verdict should have been sustained. The judgment is, therefore, reversed with

instructions to the district court to render and have entered a judgment for the defendant and against the plaintiff.—Reversed.

HALE, C. J., and MITCHELL, STIGER, SAGER, MILLER, and WENNERSTRUM, JJ., concur.