**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a corporation, Appellant,**

v.

**PIONEER VALLEY SAVINGS BANK, a corporation, Appellee.**

No. 17625.

United States Court of Appeals
Eighth Circuit.

March 30, 1965.

Wiley E. Mayne, of Shull, Marshall, Mayne, Marks & Vizintos, Sioux City, Iowa, made argument for appellant and filed brief with Jesse E. Marshall and Charles R. Wolle, of Shull, Marshall, Mayne, Marks & Vizintos, Sioux City, Iowa.

Kenneth T. Wilson, of Stilwill, Wilson & Rhinehart, Sioux City, Iowa, made argument for appellee and filed brief with Charles F. Stilwill, of Stilwill, Wilson & Rhinehart, Sioux City, Iowa.

Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and DELEHANT, Senior District Judge.

DELEHANT, Senior District Judge.

Pioneer Valley Savings Bank v. Indemnity Insurance Company of North America, D.C., 225 F.Supp. 404, has been brought to this court on appeal by Indemnity Insurance Company of North America, the defendant therein. In the combined service of brevity and simplicity, its only two parties are severally referred to herein by their respective designations in the trial court, that is to say, the appellee as "plaintiff," and the appellant as "defendant." The appeal has been fully submitted.

A disclosure of the pleadings in the trial court is first offered. The complaint

of the plaintiff is set out in two separately numbered counts. Each of the two counts seeks recovery against the defendant of the same claimed sum of money, but upon a different and distinct ground or theory.

By the first six numbered paragraphs of Count I, plaintiff alleges its incorporation in, and citizenship within, the state of Iowa; the defendant's incorporation under the laws of the Commonwealth of Pennsylvania, and legally authorized engagement in business in Iowa; the existence of diversity of citizenship, and of a controversy between the parties exceeding the sum or value of $10,000.00, exclusive of interest and costs; the plaintiff's engagement at all material times in a banking business, with its principal place of business in Sergeant Bluff, Woodbury County, Iowa;[1] the execution by the defendant, on or about May 21, 1960, for valuable consideration, of its "Bankers' Blanket Bond, Form No. 24," numbered S226298 to and in favor of the plaintiff, wherein it agreed to indemnify and hold harmless the plaintiff to an amount not exceeding $75,000.00, from and against any losses therein set out, of which bond a copy was attached to the complaint, which bond was in full force and effect at all times material to the complaint; among which losses so covered, as quoted from the bond, was the following:

### "ON PREMISES

(B) Any loss of Property through robbery, burglary, common law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damages thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees."

It is to be understood that, in its answer, the defendant expressly admits all of the foregoing factual allegations. Without more, they are to be regarded as true in the litigation at its every stage.

Those admitted allegations are followed by the allegation by the plaintiff, in the 7th numbered paragraph of the complaint, that:

"7. On or about the 13th day of October, 1960, the plaintiff sustained a loss of property in the amount of $35,000.00 through false pretenses, said loss being indemnified against by the aforesaid bond and occurring as hereinafter more fully set out."

And that averment is followed by allegations in successive paragraphs numbered as now set out and quoted, or summarized, in this manner:

| Paragraph Numbered | Substance |
| --- | --- |
| 8 | On or about October 10, 1960, there were received at Early Savings Bank, Early, Iowa, several checks exceeding in their aggregate sums $33,000.00 drawn by Paul Dick of Early, Iowa, on his account in that bank, which had theretofore been deposited in the account of his sister, Marie Longman, in Citizens State Bank, Sac City, Iowa, against which checks and deposit, Citizens Savings Bank had paid out funds in the sum of $33,610.70. When such checks arrived at Early Savings Bank, no funds were in the account in such bank of Paul Dick wherewith to pay them. Early Savings Bank notified Citizens Savings Bank that the checks were being returned for insufficient funds. Citizens Savings Bank notified Paul Dick that the checks were being returned, and he informed the bank that he would get a draft wherewith to pay them. |
| 9 | Thereafter, but also on October 10, 1960, Paul Dick and his mother, Elizabeth Dick, went to Arthur Trust and Savings Bank, Arthur, |

1. The city of Sioux City is also located in Woodbury County, Iowa. The distance between Sergeant Bluff and Sioux City is shown by the evidence to be approximately eight miles.

Iowa, and to it presented two checks each for the sum of $17,500.00, bearing date October 10, 1960, drawn against her account in Citizens Savings Bank, Sac City, Iowa, by Marie Longman, Paul Dick's sister, and payable to the order of Elizabeth Dick, and therewith purchased draft numbered 21,691 of Arthur Trust and Savings Bank, on its correspondent bank, The Iowa Des Moines National Bank, dated October 10, 1960, for $35,000.00.

10 During the afternoon of the same day, namely, October 10, 1960, draft numbered 21,691, so drawn by Arthur Trust and Savings Bank for $35,000.00, and by that time, endorsed by the payee, Elizabeth Dick, was by Paul Dick deposited in an account by him maintained in Early Savings Bank under the name of "Early Iron and Metal Company," which draft was, by the drawee bank, Iowa Des Moines National Bank, honored and paid on October 11, 1960. And from the funds thus provided, Paul Dick, on October 12, 1960, purchased Draft No. 23,821 of Early Savings Bank on its correspondent bank, The Iowa Des Moines National Bank, in the sum of $33,610.70, payable to the order of Citizens Savings Bank, Sac City, Iowa, which Paul Dick delivered to Citizens Savings Bank, Sac City, Iowa, in exchange for his checks which had theretofore been deposited in the account of his sister, Marie Longman, in Citizens Savings Bank, Sac City, Iowa, and been returned to it unpaid, for want of sufficient funds, by Early Savings Bank. (see paragraph numbered 8, supra)

11 On October 12, 1960, the two checks of Elizabeth Dick, each for $17,500.00, thus aggregating $35,000.00, which had been given to Arthur Trust and Savings Bank for the purchase of its draft numbered 21,691 for $35,000.00, arrived at the drawee bank, Citizens Savings Bank, Sac City, Iowa, and there were insufficient funds for their payment; whereupon, Citizens Savings Bank so notified Paul Dick, and Paul Dick informed Citizens Savings Bank that he would, by noon, October 13, 1960, have a deposit for the account of his sister, Marie Longman, to the credit of Citizens Savings Bank, in its correspondent bank, Security National Bank, Sioux City, Iowa, to cover such checks.

12 In the morning of October 13, 1960, Paul Dick and his mother, Elizabeth Dick, came by automobile to plaintiff's bank at Sergeant Bluff, Iowa. Plaintiff was theretofore and then acquainted with Paul Dick, and knew him as an officer of Early Savings Bank, Early, Iowa, and the operator of a scrap and salvage yard at Early, Iowa, and also as a former bank examiner for the State of Iowa. Paul Dick, at that time and place, made the folowing statements and representations to plaintiff: that he was then on his way to Omaha to bid on some rail scrap and rails; that he then needed a draft or cashier's check in the amount of $35,000.00 to be used in making the bids; that the alleged sellers of the scrap wanted the draft or cashier's check to be payable to Citizens Savings Bank; that he had in his possession at that time sufficient funds to cover his checks to be given in payment of the cashier's check or draft; that the checks to be given by him in payment for the cashier's check or draft were absolutely good; and that he was then vice president of Early Savings Bank, Early, Iowa. The plaintiff, believing and relying upon the truth and good faith of those statements and representations of Paul Dick, drew and sold and delivered to him its draft numbered 28,780 for the sum of $35,000.00 drawn on its correspondent

bank, The Live Stock National Bank, Sioux City, Iowa, of which draft a copy is attached to the complaint and made a part thereof, and, accepted in payment therefor two checks of Paul Dick, each for $17,500.00, drawn on Early Savings Bank, Early, Iowa, of each of which two checks a copy was also attached to the complaint, and made a part thereof.

13 Paul Dick used his own account in Early Savings Bank, the account of Early Iron and Metal Company, in Early Savings Bank, and the account of his sister, Marie Longman, in Citizens Savings Bank, Sac City, Iowa, and caused to be issued in the name of his mother, Elizabeth Dick, draft numbered 21,691 of Arthur Trust and Savings Bank, and the checks given in payment therefor to further his fraudulent scheme and purpose, as set out in the complaint.

14 After so obtaining the draft of plaintiff in the amount of $35,000.00, supra, and also, on October 13, 1960, Paul Dick proceeded to Security National Bank, Sioux City, Iowa, a correspondent bank for Citizens Savings Bank, Sac City, Iowa, and deposited such draft of plaintiff in Security National Bank to the account of Citizens Savings Bank, Sac City, Iowa, to be credited to the account therein of Marie Longman. Citizens Savings Bank, Sac City, Iowa, was notified that the draft in the sum of $35,000.00 was deposited to its credit in Security National Bank, Sioux City, Iowa, and at "their" (sic) request, the draft was taken by messenger to Live Stock National Bank, Sioux City, Iowa, and presented for payment, and a cashier's check of Live Stock National Bank was obtained. Citizens Savings Bank then honored the two checks, each for $17,500.00, which had been given to Arthur Trust and Savings Bank, and had been presented for payment, the payment of such checks aggregating $35,000.00, being made with the deposit and credit of the $35,000.00 so obtained from plaintiff by Paul Dick.

15 On or about October 19, 1960, the two checks, each for $17,500.00, given by Paul Dick to plaintiff in payment for its draft numbered 28,780, were dishonored for insufficient funds, and were returned to plaintiff and, at the time of the institution of this action, were in plaintiff's possession and unpaid, uncollectible and worthless, and plaintiff had thereby sustained a loss in the sum of $35,000.00.

16 The representations, statements and pretenses so made to plaintiff by Paul Dick, supra, were false and untrue, and were made knowingly and designedly for the purpose of obtaining the property of plaintiff, and with the intent to defraud plaintiff of $35,000.00. In truth and in fact, Paul Dick was not on his way to Omaha to bid on some rail scrap and rails, but the plaintiff's bank at Sergeant Bluff was his destination for the express purpose of defrauding plaintiff of $35,000.00. In truth and fact, Paul Dick did not need a cashier's check or draft in the amount of $35,000.00 to be used to bid on rail scrap and rails but did need it, and used it, as a deposit in the account of his sister, Marie Longman in Citizens Savings Bank, Sac City, Iowa, which he was using for his own purposes, to cover and pay two checks each in the amount of $17,500.00 which had been given on October 10, 1960, to Arthur Trust and Savings Bank; and in which amount such bank account had been overdrawn. In truth and in fact, Paul Dick at such time did not have in his possession sufficient funds to cover the two checks given by him in payment for plaintiff's draft numbered 28,780. In truth and fact, the two checks given in payment for such draft were not good,

and were worthless, and were known by Paul Dick to be worthless when he delivered them to plaintiff. The statement and representation to plaintiff that the alleged sellers of the scrap wanted the cashier's check or draft payable to Citizens Savings Bank were false and untrue, and were made for the sole purpose of leading plaintiff to believe that the seller of the scrap had thus so requested and that the obtaining by Paul Dick of plaintiff's draft was for a legitimate business purpose. In truth and in fact, Paul Dick was not then Vice-President of Early Savings Bank, his employment with said bank having been terminated on October 8, 1960, and he had no position with such bank on October 13, 1960.[2]

17 In addition thereto, the procurement by Paul Dick of plaintiff's draft numbered 28,780 in the sum of $35,000.00 from plaintiff was a part of a "kiting" scheme, plan, device, fraud and false pretense, on the part of Paul Dick.

18 Plaintiff, on or about October 21, 1960, and within a reasonable time after learning of the loss above alleged, gave the defendant written notice as reflected in a copy of such notice attached to and incorporated in the complaint herein; and on or about January 19, 1961, filed with defendant an itemized proof of claim, duly sworn to on a form therefor furnished by the defendant, of which proof a copy is attached to and incorporated in the complaint; and had fully performed all of the terms and conditions of the plaintiff required under such Bankers' Blanket Bond.

19 By reason of the foregoing matters and things, the plaintiff had sustained a loss in the amount of $35,-000.00. Such loss was indemnified against, and covered, by the Bankers' Blanket Bond theretofore identified in the complaint. The defendant had failed and refused to pay such loss, and there was due and owing to plaintiff from defendant, on account thereof, the sum of $35,000.00, together with interest thereon at the rate of six per cent per annum from October 13, 1960, no part of which had been paid.

And, concluding such Count I of the complaint, plaintiff prayed for judgment against the defendant in the sum of $35,000.00, with interest as last above specified, and costs of this action.

By way of answer to Count I of the Complaint, the defendant, in addition to its admission (already set out herein) of the averments of the first six numbered paragraphs of the complaint, also admitted the averments of paragraph numbered 18 of the complaint, which have to do with notice of loss, and the making and filing of proof of claim, and also with plaintiff's full performance of all of the terms and conditions required of it under the bond in suit; and categorically denied the allegations of each of paragraphs numbered 7, 12, 16, 17 and 19 of the complaint; and "for lack of information" denied the allegations of each of paragraphs numbered 8, 9, 10, 11, 13, 14 and 15.

2. Upon the trial, it was proved by evidence that Paul Dick had resigned as Vice-President of Early Savings Bank on October 8, 1960, thus only two days before the dates mentioned in the complaint incident to the movement between sundry banks of the several insufficient fund checks; that his resignation resulted from pressure upon him prompted by his then recent practice of writing insufficient fund checks. It was also similarly proved that Paul Dick's personal bank account in Early Savings Bank had undergone no actual activity or change since October 6, 1960; that the balance in it as of October 7, 1960 was seventy-six cents, and so remained; and that, by examination after Paul Dick's resignation, *supra*, it was discovered that he was "short" in his dealings with Early Savings Bank in the sum of about $27,362.50, of which payment was later made to the bank by the surety on a bond to the bank.

Also in and by its answer, and as an asserted affirmative defense to Count I of the Complaint, the defendant alleged that:

"1. The Bankers' Blanket Bond referred to in the complaint contained the following exclusion:

"THE FOREGOING AGREEMENT IS SUBJECT TO THE FOLLOWING CONDITIONS AND LIMITATIONS:

"Section 1. THIS BOND DOES NOT COVER: (d) Any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except when covered by Insuring Clause (A) or (D)."

2. "The transaction between plaintiff and Paul Dick which took place October 13, 1960 was a loan in that at the time Dick gave plaintiff the checks totaling $35,000.00 drawn on the Early Savings Bank, he disclosed to plaintiff that he did not presently have funds in the Early Savings Bank sufficient to to cover said checks, and represented to plaintiff that he would later deposit funds in the Early Savings Bank sufficient to cover such checks. At no time did Dick represent to plaintiff that funds sufficient to cover the checks were already in the Early Savings Bank. In drawing and delivering its draft numbered 28,780 to Paul Dick in reliance upon his representation that he would later deposit sufficient funds to cover the two checks, plaintiff made a loan to Dick extending him credit in the amount of its draft. If plaintiff suffered loss thereby, it is the result of non-payment or default upon said loan made by or obtained from the plaintiff, and such loss is not covered by the Bankers' Blanket Bond referred to in plaintiff's complaint, being excluded from coverage by the provisions of the bond in Section 1(d) which are set out in paragraph 1 of this affirmative defense."

Count II of the plaintiff's complaint and the defendant's answer to it, may, with the aid of the foregoing reflection of Count I of the complaint, and of the answer to it, be disclosed very briefly. Count II of the plaintiff's complaint, simply adopted and incorporated into itself by reference the allegations of all of the numbered paragraphs of Count I, except the paragraph thereof numbered 7; and as paragraph 2 of Count II, instead of paragraph numbered 7 of Count I, made this allegation:

"That on or about the 13th day of October, 1960, the plaintiff sustained a loss of property in the amount of $35,000.00 through common-law or statutory larceny, said loss being indemnified against by the aforesaid bond and occurring as hereinafter more fully set out," the setting out thus adverted to being the adopted (supra) averments of paragraphs numbered 8 to 19, both inclusive of Count I.

And the defendant's answer to Count II simply (a) made, in respect of the averments of the paragraphs of Count I numbered consecutively from 1 to 19 (except paragraph numbered 7) as incorporated into Count II, admissions and denials respectively in like manner as it had made to them in answering Count I, supra; (b) denied the averments of paragraph numbered 7 of Count I, as adopted and reaverred by reference in paragraph numbered (2) of Count II, supra; and (c) alleged as an asserted affirmative defense to Count II the same factual material similarly set out in its answer to Count I, supra.

Ordinarily the foregoing comprehensive reflection of the entire contents of the complaint and answer in the trial court would not be appropriate here. But it is offered precautionarily upon the premise that the alleged dealings by Paul Dick with the plaintiff on October 13, 1960, and Paul Dick's acts and conduct ensuing next thereafter, are so far articulated into the factual matters set out

in paragraphs numbered 8, 9, 10, 11 and 13 of Count I of the complaint, that the contents of those paragraphs, and also of the other material related to them, should be brought expressly into focus.

The action was tried to the District Court without a jury, the Honorable William C. Hanson, one of the judges of that court, presiding. Upon the rest of the plaintiff at the conclusion of its evidence in chief, the defendant in open court tendered a motion or motions for the entry of judgment in its behalf upon Count I, upon Count II, and upon both counts, which were by the trial court wholly denied and overruled. The defendant thereupon introduced evidence in its behalf, and rested, and the plaintiff introduced evidence in rebuttal. Submission was thereupon made to the trial court. On January 21, 1964, the court, Judge Hanson presiding, filed and entered its memorandum opinion (see 225 F. Supp. 404), and its judgment, and also its substituted judgment, in which substituted judgment it awarded to the plaintiff "judgment against the defendant in the sum of $35,000.00, together with interest at 5% per annum from October 13, 1960, together with the costs of this action." [3] Defendant filed its notice of appeal on February 18, 1964.

Proceeding under Rule 75(d), Federal Rules of Civil Procedure, the defendant, on March 20, 1964, filed its "Statement of Points on Appeal," in which these points only were identified.

"1. The Trial Court erred in overruling defendant-appellant's motion to enter judgment for defendant-appellant, made at the close of plaintiff-appellee's case and after plaintiff-appellee had rested.

2. The Trial Court erred in granting judgment in favor of plaintiff-appellee, Pioneer Valley Savings Bank, and against defendant-appellant, Indemnity Insurance Company of North America."

Diversity of citizenship is alleged and admitted, supra, and unquestionably exists. And the entire record discloses the existence of a matter in controversy which exceeds the sum or value of $10,-000.00, exclusive of interest and costs, supra. It is, therefore, observed without discussion that jurisdiction exists under Title 28 U.S.C. § 1332(a).

At the outset, we confront a contention in behalf of plaintiff, as appellee, that, in consequence of the language of defendant's Statement of Points on Appeal, supra, the defendant "presents nothing for review by this court." That position is advanced as an imperative conclusion from the asserted premise that "the points relied upon by the defendant do not challenge any specific finding of fact, conclusion of law, or ruling on the admissibility of evidence but in effect amount to nothing more than an assertion that a wrong judgment was entered, without stating wherein the judgment was wrongfully entered."

We need not determine whether we should have granted that contention of the defendant if it had been asserted earlier than its actual appearance in this litigation. The date of filing of defendant's Statement of Points on Appeal has already been noted. Two months, five days thereafter, on May 25, 1964, the defendant filed concurrently, its (a) Record, and (b) Appellant's Brief. On July 6, 1964, plaintiff concurrently filed its (a) Supplement of Appellee to Record in seventy-six printed pages, and (b) Appellee's Brief, in the latter of which it raised the question now adverted to. On July 22, 1964, the defendant filed concurrently its (a) Supplement of Appellant to Record, and (b) Appellant's Reply Brief. So far as we are aware, we have thereby been put into possession of the entire record in this case. Moreover, in the briefs and oral arguments here, the issues that appear to exist in the case, including all of those mentioned in Judge Hanson's memorandum and in

---

**3.** The judgment originally entered was inexplicit touching the rate and initiatory date of interest. Hence, the substituted judgment.

this opinion, or in either of such rulings, have been thoroughly discussed.

■ Unquestionably, authority exists for the exercise of the power now invoked by the restrictive application of a Statement of Points on Appeal. Yet, even under such authority a measure of discretion is left to the appellate court, whereunder it may consider an appellant's claim of error, even despite its inadequate assertion, especially when the pertinent record appears fully to be before the court, and the controverted questions have actually been argued. Koolvent Metal Awning Corporation of America v. Bottom (8 Cir.), 205 F.2d 209; Woodbury v. Clermont (9 Cir.) 236 F.2d 132; Watson v. Button (9 Cir.) 235 F.2d 235; Western National Insurance Company v. Le Clare (9 Cir.) 163 F.2d 337; Boston and Maine Railroad v. Jesionowski (1 Cir.) 154 F.2d 703; and rather more liberally, Foremost Dairies, Inc. v. Ivey, (5 Cir.) 204 F.2d 186; El Chico, Inc. v. El Chico Cafe (5 Cir.) 214 F.2d 721; and Ashton v. Town of Deerfield Beach, Broward County, Florida (5 Cir.) 155 F.2d 40.

■ In the present appeal, the challenged questions which the defendant tenders appear to have been addressed to the trial court, the record upon which they are presented here seems to be complete, and they have been briefed and argued in this court. They ought, we think, squarely to be met and determined. We, therefore, proceed to the consideration of the substituted judgment, and the memorandum of the trial judge, both under date of January 21, 1964.

As reflective of the findings of fact and conclusions of law announced in this action by the trial court, we refer, without needless copying, to Judge Hanson's published opinion in Pioneer Valley Savings Bank v. Indemnity Insurance Company of North America (D.C.Ia.) 225 F.Supp. 404. For that court's findings of fact, reference is made, not alone to the section of the opinion captioned, "FINDINGS OF FACT," appearing on page 406, but, as well, to so much of the body of the opinion as precedes that capitalized caption, for it, too, contains factual findings preceded at some points by explanatory and instructive allusions to pertinent portions of the pleadings which illuminate the judge's strictly factual determinations. For the trial court's conclusions of law, reference is made to all of the published opinion which follows the caption, "CONCLUSIONS OF LAW" appearing in the second column of page 406. We consider it unnecessary here to repeat those findings of fact and legal conclusions in detail, to challenged portions of which, however, identifying references are made later herein.

■ One consideration, however, is to be kept in view. The trial court's findings of fact and conclusions of law are to be evaluated and understood in their actual setting. Thus, the several checks and drafts discussed in those findings and conclusions, and the dealings with them of the persons who, and corporations which, had such dealings are to be regarded in their proper relations to the several transactions alleged in the separate paragraphs of the complaint, supra, with which such drafts and checks were respectively connected, and were so identified by the evidence.

■ This court presently proceeds in full awareness of the proper limitations upon its judicial authority in the instant litigation. It is a reviewing tribunal, not a trial court. That is equally true in this action which, though potentially triable to a jury, was by the parties voluntarily submitted to the trial court without a jury, as it would have been in a suit, equitable in character, which from its inception would have been triable to the court without a jury, and determinable by the trial judge alone. In the exercise of our reviewing function, the sufficiency of the evidence to support the trial court's findings and judgment is certainly a question appropriate for our consideration. But whether this court thinks that it would or might have made different findings of fact or entered a different judgment, if it had been the trier of the facts, is of no

consequence here. This court, therefore, refrains from the exercise of any of the trial functions by law conferred upon the district courts. Doing which, however, it does not fail to recognize, and in proper circumstances to exercise, its authority to set aside findings of fact if they be "clearly erroneous." Rule 52 (a), Federal Rules of Civil Procedure; Barryhill v. United States (8 Cir.) 300 F.2d 690, 693, 694; Mothner v. Ozark Real Estate Company (8 Cir.) 300 F.2d 617; Dierks Lumber and Coal Company v. Barnett (8 Cir.) 221 F.2d 695, 697.

 Moreover, in appellate review of a decree in equity, and similarly of a judgment in an action at law tried by the court upon waiver of jury trial, the prevailing party is entitled both to the acceptance by the reviewing court of that view of the evidence which is most favorable to such prevailing party, and likewise to the benefit of all favorable inferences which may reasonably be drawn from the facts proved, and if, when so viewed, there be substantial evidence to sustain the findings of the trial judge, then the judgment may not be reversed by the appellate court, unless it be against the clear weight of the evidence, or unless it be influenced by an erroneous view of

the law. Cleo Syrup Corporation v. Coca-Cola Company (8 Cir.) 139 F.2d 416, 150 A.L.R. 1056;[4] Rennicke v. United States (8 Cir.) 207 F.2d 429; Wilson v. New York Life Insurance Company (8 Cir.) 250 F.2d 649; United States v. Skolness (8 Cir.) 279 F.2d 350.

 Likewise, the considered opinion of a trial judge as to a question of local law may properly be accorded great weight by an appellate court. This does not mean that an appellant, in order to obtain a reversal of a judgment so tried must demonstrate error to a mathematical certainty, but it does mean that the appellate court will not overrule a decision of a trial judge upon a question of state law except for cogent and convincing reasons. All that the appellate court reasonably can be expected to do in reviewing cases governed by state law is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the law.[5] Russell v. Turner (8 Cir.) 148 F.2d 562; Central Nebraska Public Power and Irrigation District v. Tobin Quarries, Inc. (8 Cir.) 157 F.2d 482; Buder v. Becker (8 Cir.) 185 F.2d 311. That rule has been stated in slightly different language but to like effect, thus: "In dealing with

4. In that opinion it was pointedly said by the Honorable John B. Sanborn, recently deceased, then a judge of this court, that: "This Court upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mut. Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398. The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F. 2d 698, 701 (affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251); Travelers Mutual Casualty Co. v. Rector, supra. In a nonjury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evi-

dence, or unless it was induced by an erroneous view of the law. Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1, 4, 5; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, supra. The District Court, in making its findings, was under no misapprehension as to the applicable law. See Kann v. Diamond Steel Co., 8 Cir., 89 F. 706, 707; My-T Fine Corporation v. Samuels, 2 Cir., 69 F.2d 76, 77; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 335, 336, 59 S.Ct. 191, 83 L.Ed. 195. In determining whether there is a sufficient evidentiary basis for the court's findings of fact, we must take that view of the evidence and the inferences deducible therefrom which is most favorable to the plaintiff."

5. A virtual duplication of the comment of Judge Sanborn in Russell v. Turner, 148 F.2d 562, 564.

such questions" (i. e. questions of the local law of the state in which the federal trial court sits) "we will accept the considered views of the District Judge, unless clearly persuaded that they are erroneous." See Western Casualty and Surety Company v. Coleman (8 Cir.) 186 F.2d 40; Western Oil and Fuel Company v. Kemp (8 Cir.) 245 F.2d 633, at p. 645; Hartford Accident and Indemnity Company v. Baldwin (8 Cir.) 262 F.2d 202.

The defendant tenders the argument that the trial court erred in holding that plaintiff could recover herein under the bond, even though not proving every element of the commission by Paul Dick of the crime of false pretenses under the law of Iowa, with the same strictness as that required to sustain conviction in a criminal prosecution. In support of that position it cites, and appears to rely upon, two decision of the Supreme Court of Iowa, Williamstown Creamery Association v. American Surety Company, 205 Iowa 830, 218 N.W. 474, and Cedar Rapids National Bank v. American Surety Company, 197 Iowa 878, 195 N.W. 253. It is not by this court believed that either of those cited opinions adequately supports the position in behalf of which it is thus advanced. In the Creamery Association case, the plaintiff association sued the Surety Company on a bond issued by the Surety Company indemnifying the Association against "loss resulting from embezzlement" by its *treasurer*. Upon evidence showing that funds of the Association were deposited regularly by the *president* or the *secretary* of the Association in a bank of which the insured treasurer of the Association was president, but that the insured treasurer of the Association was not even claimed to have misapplied, converted or appropriated to his own use any sum belonging to the Association, or to have used any sum belonging to the Association for his personal purposes or those of the bank, the Supreme Court of Iowa affirmed a judgment on a directed verdict in behalf of the Surety Company. That ruling was poised on the failure to prove any em-

bezzlement at all. And it obviously was supported by the complete failure to establish any wrongdoing at all by the insured treasurer, and, therefore, any "felonious intent" on his part. Quite irrespective of details, there was in that case a failure to bring home to the insured treasurer either any embezzlement or any other wrongful act. And in the Cedar Rapids National Bank case, a suit by the bank against the Surety Company on a policy insuring the bank against loss "through theft" (among other things, not including "false pretenses"), the Supreme Court reversed a judgment for plaintiff pursuant to a directed verdict in its behalf, the reversal being placed on the ground that the loss was attributable, not at all to "theft," but rather and solely to "false pretenses." Neither of those cited cases reaches the problem concerning which the defendant here cites them.

In the present case, Judge Hanson, after his preliminary statement of the pleadings and his findings of fact and quotations of statutes relied on by the litigants, discussed the question at this juncture involved, under headnotes numbered (1) to (8), both inclusive, of his opinion (see 225 F.Supp. at pp. 407 to 410, both inclusive). So doing, he cited and stood squarely upon the law of Iowa. That is not less true because, as well, he offered supportive authority from other jurisdictions. In that discussion he recognized and cited certain rulings, both in the Supreme Court of Iowa, and in this court, and also rulings in other federal courts signifying the existence of judicial doubt whether, and to what extent, an action brought on a "Bankers' Blanket Bond" of the character here involved is necessarily determinable by the answer to the question whether the alleged "false pretender" would be punishable under the local criminal "false pretenses" statute of the state in which the asserted wrong arose. Suggestively, but not exclusively, these included Judge Graven's opinion in Home Federal Savings and Loan Association v. Peerless Insurance Company (D.C. Iowa) 197 F.Supp. 428 (involving forgery); and this court's

opinion in The Fidelity and Casualty Company of New York v. Bank of Altenburg (8 Cir.) 216 F.2d 294 (which arose in Missouri). But the trial court, through Judge Hanson, expressly concluded and declared that the crime of false pretenses, in Iowa, may be predicated under either section 713.1 or section 713.3 of the Iowa Code, I.C.A., the former being expressly identified as a "False Pretenses" statute, the latter as the statute denouncing the "False drawing or uttering of checks." And it further concluded and held that, under the facts of this action then before it, a case had been made out of the violation of section 713.1, but also of the violation of section 713.3, which in the trial court's view defined an offense of which false pretense was likewise an ingredient. In his course to that ruling, the trial judge both made factual findings fully supported by the evidence before him, and arrived at, and administered, a legal determination which is not only clearly permissible, but, in our opinion, correct and inescapable.

The defendant further insists that the trial court erred in construing the terms of the bond favorably to the insured when such construction was contrary to the clear and unambiguous meaning of the policy. By way of specification of such alleged constructional error, the defendant suggests that the trial court's interpretation (a) of the coverage provision as just adverted to, supra, and (b) in determining the existence of evidence supporting a finding of the causation of the loss by false premises was, in each instance, too broad, and that its application of the policy's "loan exclusion" provision, infra, was too narrow. This court is of the opinion that the trial judge, in the application of the law of Iowa respecting the construction as between the insurer and the insured, of policies of insurance, proceeded correctly and arrived at the proper, not to say a merely permissible, conclusion.

 It is true, as the defendant contends, that if the language of a policy of insurance is clear and unambiguous,

it is the simple duty of the trial court to give effect to such contractual language in harmony with its plain and unambiguous meaning. The trial court is not clothed with the authority to make, or to revise, the contract of the parties. Field v. Southern Surety Company, 211 Iowa 1239, 235 N.W. 571; Mallinger v. State Farm Mutual Automobile Insurance Company, 253 Iowa 222, 111 N.W.2d 647; Community Federal Savings and Loan Association of Overland v. General Casualty Company (8 Cir.) 274 F.2d 620; Indianola Country Club v. Fireman's Fund Insurance Company, 250 Iowa 1, 92 N.W.2d 402. However, by its own terms, that rule is applicable only if the policy be not susceptible of different constructions. On the other hand, if the policy may reasonably be regarded as ambiguous, that is to say as susceptible of different constructions, it should by the trial court be so construed as to effectuate the intention of the parties, and in such construction that interpretation of the policy should be arrived at which is most favorable to the insured. Indianola Country Club v. Fireman's Fund Insurance Company, supra; Brush v. Washington National Insurance Company, 230 Iowa 872, 299 N.W. 403; Rogers v. Maryland Casualty Company, 252 Iowa 1096, 109 N.W.2d 435; Home Federal Savings and Loan Association v. Peerless Insurance Company (D.C.Ia.) 197 F. Supp. 428. Concerning the existence of the rule herein set out, there appears to be no present dispute between the parties. The primary question arises as to whether in the particulars specified by the defendant, the policy is itself clear and unambiguous.

This court has no doubt from the record before it that in his ruling, Judge Hanson proceeded not only permissibly, but also correctly, in his construction of the policy in suit, within the limited number of areas in respect of which he did construe it, as disclosed in his memorandum opinion, and in his application of it to the facts as established by the evidence, and as found by him. It may not correctly be asserted that, in those re-

spects, the policy was inescapably "clear and unambiguous," within the meaning of those terms. The contract may not itself be said, beyond question, to disclose unmistakably, (a) precisely how far, if at all, and in what, if any, manner the words, "common law or statutory" modify, or limit, or attribute meaning to, the words, or (b) by what definition "false pretenses" must be understood, suggestively after the exclusive manner of the pertinent criminal statute—or statutes—of Iowa, or according to the common understanding of the expression, or even and, perhaps alternatively, after the manner of the early "common law false pretenses," conceivably with modernizing modifications. And, with respect to the ostensibly simple exclusionary word "loan" the allowable dubiety is even more obvious. Is it limited to the understanding of a banker as applied in his preparation of a balance sheet, or statement, or report, for his institution? Or does it by rationalization, extend to and include, every situation out of which an obligation financially measurable from a person, firm or corporation to a banking association may arise? This court is persuaded that, as the judge in the trial without a jury, Judge Hanson was obliged to construe the contract between the parties, and to determine the claim in the light of that construction, and according to the evidence.

And this court further concludes, as appears elsewhere in this opinion, that the trial judge arrived at the correct conclusion upon the phases of the case affected by his construction of the policy, et supra et infra.

■ To the defendant's declaration that, "there is no evidence in the record to support the finding that Dick's statement was false, insofar as the existence of checks in his portfolio at the time in question is concerned," this court's response is that the defendant's declaration is without rational support. True, so far as the record shows, Dick never admitted, nor was it proved by direct testimony, that he lied when he stated to Adam Wies, then the executive vice-president of the plaintiff bank,[6] that he had with him at the plaintiff's bank and in a portfolio, checks in amounts more than enough to cover the $35,000.00 draft which he was seeking, which checks he would deposit in Early Savings Bank on the next ensuing day. The defendant's presently considered point concerns support in the record only for the trial judge's finding that he did not then have such checks. But Dick's statement now under consideration was not an isolated assertion. It, and its truth or falsity, must be understood in its context. That context has already been disclosed in the findings of the trial court, abundantly supported by the evidence in the record. And let it be noted that a significant portion of that context is to be found in the deceptive diversionary and dishonest banking manipulations in which Dick had engaged, supra, through the three days immediately preceding his appearance at plaintiff's banking house in the morning of October 13, 1960, as reflected in paragraphs numbered 8, 9, 10, 11, and 13 of the complaint, and as fortified by the related evidence, and in what he did immediately on leaving plaintiff's bank after obtaining the draft for $35,000.00, and in the dishonoring in due time thereafter of his own two checks each for $17,500.00, both as reflected in paragraphs numbered 14 and 15 of the complaint. That context, too, includes Dick's coerced resignation on October 8, 1960, as Vice-President of Early Savings Bank, which, in his quest of plaintiff's draft, he mendaciously concealed from Adam Wies, and about which he directly lied to the lady who was Cashier of the plaintiff's bank, infra, his then recent issuance of insufficient funds checks, leading to his resignation, supra, and his substantial shortage in his financial dealings for, and as an officer of, Early Savings Bank, all supra. Finally, the checks which he declared he had in his portfolio never turned up. In the

6. At the time of the trial and, for some months theretofore, he was the president of plaintiff.

situation thus disclosed, what further evidence could be required or sought in proof of the falsity of Dick's assertion of his possession in his portfolio of checks exceeding $35,000.00 in the morning of October 13, 1960? To suppose that he had them would require the possession of credulity in degree even greater than that which may be attributed to a United States District Judge.

 The defendant asserts error for alleged want of evidentiary support for the trial court's finding that Paul Dick misrepresented his position and credit with Early Savings Bank to Adam Wies, and that plaintiff relied on such representation. Again, the assertion is without merit and unrealistic. Adam Wies, on October 13, 1960, the Executive Vice-President of plaintiff bank, had known Paul Dick personally for several years. Dick had been a state bank examiner for about six or eight years, during which he had made semi-annual examinations of plaintiff's bank with which Adam Wies had been associated in an executive capacity since January 19, 1925. For two or three years, before October 13, 1960, and after his resignation as bank examiner, Dick had lived at Early, and been engaged in the scrap metal business there, and had also been active as the Vice-President of Early Savings Bank. Wies, therefore, knew Dick in those relations, and so far as Wies was aware, there had been no change in Dick's position with the Early Savings Bank.

When Dick on the morning of October 13, 1960, came to the banking house of the plaintiff, Adam Wies was absent on an errand in Sioux City, from which he returned at about ten thirty o'clock. Dick, on his arrival, conversed briefly with Mrs. Blanche Waterman, the Cashier of the plaintiff bank. She also knew Dick in the same relations as did Adam Wies. In that conversation, as the record discloses, Mrs. Waterman asked Dick questions; and he made answers, which are reflected as follows in the record of the testimony of Mrs. Waterman, as a witness upon the trial.

"Q. And did you have a conversation with Mr. Dick?

"A. Yes.

"Q. And just tell the Court, please, what he said to you and what you said to him?

"A. Well, it was mostly just visiting and I was surprised to see him because I knew he was at Early. I said to him, I said, 'Are you still at the Early Bank?' and he said, 'Yes,' and I said, I didn't recall, I knew he was an officer, but I said, 'Are you cashier?' and he said, 'No, I'm vice president.' Then I inquired as to—he always as he examined the bank, he used to speak so highly of his mother and so I, just in the conversation, I asked him how his mother was and he said, 'She's fine. She's out in the car.' So then I asked him why he didn't bring— to bring her in because he said he wanted to see Mr. Wies, and he said he'd wait out in the car."

Thus, to an officer of the plaintiff, though not the one who was shortly to be approached by Dick concerning his project, Dick in answer to direct questioning not only declared positively, but falsely, that he was then presently "still at the Early Bank" but also, to an inquiry whether he was cashier, answered, and again falsely, "No, I'm vice president."

And almost immediately thereafter, in the ensuing conversation between Dick and Wies, the vice-president of plaintiff's bank, Wies, on the basis of his fairly long acquaintance with Dick, and his connection with Early Savings Bank, asked Dick questions concerning the business of the Early Savings Bank, which transparently assumed, and were understood by Dick to assume, the then currency of Dick's earlier position with Early Savings Bank; and Dick gave to Wies informative answers, of which the inevitable implication was Dick's acceptance of the assumption of his persisting employment by Early Savings Bank.

The defendant submits, with the support of testimony by Mrs. Waterman,

that she did not talk with Wies or disclose to him her conversation with Dick, until Dick had left the bank, in fact, until some not exactly established time thereafter. That is undoubtedly true. But offered as evidence that Wies, in issuing and delivering the draft for $35,000.00 did not rely on Dick's statement to Mrs. Waterman, it misses its mark. In respect of Dick's representation of the continuity of his position at Early Savings Bank, the plaintiff relies on Dick's conversation with Wies personally. In it he was palpably guilty of falsehood through the device of falsehood in a setting in which honesty called upon him to speak. One may lie effectively through the device of malicious silence. And Dick did exactly that. In addition, by his conversation with Mrs. Waterman, he reassured her and silenced her on the score of his connection with the Early Savings Bank. Judge Hanson correctly found that Paul Dick misrepresented his position and credit (through that position) with Early Savings Bank.

 Defendant further contends that the trial court erred in finding that Wies was never told by Dick, and did not know that there were insufficient funds or credit in the Early Savings Bank at the time of the issuance of plaintiff's draft, to cover the checks of Dick given as the price of such draft. While a plausible argument is made by the defendant in support of that contention, and it is not at all regarded by this court as absurd, it is, nevertheless, not well taken. Upon the score of Dick's representation that his checks were "good" when delivered, and would be paid on presentation by the drawee bank, he not only made such a statement, he reiterated it, and fortified it at least twice by reassurance of the lack of necessity or occasion to verify the worth of the checks by a precautionary contact with the drawee bank. Indeed, it might not inappropriately have been wondered by the trial court, whether in that behalf, Dick did not "protest too much." And the trial judge's finding that "Mr. Wies testified that he was never

told that there were not sufficient funds in the Early Bank to cover the checks when they were delivered to the plaintiff Bank" has the support of the evidence. In the presentation by the defendant of this point, this court is made aware of the suggestion in behalf of the defendant that implicit in Dick's disclosure of his asserted possession in his portfolio of other checks more than adequate in amount to cover the cost of the draft, and of his intention to deposit them in the Early Savings Bank on the next day, actually the next morning, is a denial or impairment of the representations concerning the value of his two checks when they were given. But that is not necessarily true. It might equally well have been a supererogatory, but quite unnecessary, gesture added to the already declared value of the tendered checks of Dick. This court, too, has respectfully studied the record of the eminently competent cross-examination of Adam Wies as a witness, oriented in a practical way not so clearly to what Dick said to Wies about the checks in his portfolio, as to what Wies subjectively concluded from Dick's statements on the score. Out of the entire record thus made, emerged a problem for the trial judge of the weighing of evidence, the determination of its probative value and significance. In that task, he proceeded with the advantage of his personal hearing and observation of the testimony, and of his appraisal of Wies as a witness. We necessarily approach the review of his findings, mindful of the canons which govern us in that service, supra. And we are convinced that his factual findings upon the point were supported by the evidence, and not clearly mistaken or erroneous. Similarly, too, we are satisfied that his legal conclusions therefrom, notably the conclusion that the material advanced by the defendant, was not sufficient to warrant a finding denying the violation of section 713.3, Code of Iowa, were both permissible and correct, supra.

 In a sweeping assignment, the defendant declares the commission of, and undertakes by extended argument to

demonstrate, error by the trial court in concluding that there was sufficient evidence that the loss sustained by plaintiff was caused by false pretenses. The assignment is considered and held to be without merit. The argument in support of it labors under the infirmity of oversimplification. And such oversimplification arises in substantial part from its begging of the defendant's position upon virtually all litigated questions. A representative reflection of the defendant's argument in support of the present point is quoted thus from its prime brief:

> "The only representations made by Paul Dick which were material to the transaction and relied upon by Wies and the bank in advancing Dick the draft were (1) that there were at that time insufficient funds in the Early Bank to cover the checks tendered to the bank, and (2) that a sufficent deposit would be made in the bank at a future time to cover the checks. The first representation was true, the second a promise or representation as to a future event. The second representation, a promise, induced the bank to part with its money, but it was not such a representation as would form the basis for conviction of the crime of false pretenses."

Actually, of those two "representations," the first was by the trial judge held, under the evidence received upon the trial, not to have been made, and the second is the defendant's construction of a part only of a representation that was made and by the trial judge found to have been made. The vice in the argument appears to arise principally from the attempt unreasonably to divorce the brief transaction at Sergeant Bluff in the late morning of October 13, 1960, from the facts which constituted its setting.

We shall not repeat beyond mere mention the findings of fact already identified and approved herein, including the considerable antecedent acquaintance and contacts between Wies and Dick; Dick's career as a bank examiner, a business man and a banker; Dick's theretofore unknown enforced severance of his connection with Early Savings Bank, and the discreditable (but on October 13, 1960 generally unknown) circumstances of it, whereof plaintiff and Wies on that date were wholly unaware; the bizarre banking transactions in which between October 8, 1960 and October 13, 1960, Paul Dick and his mother, Elizabeth Dick, and his sister, Marie Longman, engaged;[7] and, so far as the record discloses it, Dick's financial plight on October 13, 1960. It was, however, in the context emerging from all of those features that the transaction of October 13, 1960 at Sergeant Bluff occurred. That unchallengeable fact makes it impossible to appraise such transaction in complete isolation.

 The portion of the defendant's appellate argument with which we presently deal involves an effort actually to nullify for the purposes of this case the entire conversation between Dick and Wies touching Dick's possession of checks in his portfolio, and his purpose and intention to deposit them on the following day in Early Savings Bank. It is quite true that to sustain a conviction in the state of Iowa for the obtaining of money or property by false pretenses, the pretenses must be of facts past or present. It is generally stated, too, and appears to be true in Iowa, that such a conviction may not validly rest alone upon the present intention of the defendant not to comply with promises or statements by him made as to his future acts. But it is also and further true that:

> "The rule that the crime of false pretense is not predicable upon the pres-

---

7. Whether or not they may be correctly classified as "check kiting" is probably not controlling. The term is not an expression that may confidently and precise- ly be defined, a circumstance that issues out of the multiplicity of techniques through which the accomplishment of its objectives is familiarly undertaken.

ent intention of the defendant not to comply with a promise or statement as to his future acts is to be distinguished from the rule applicable to a false representation or statement regarding a past or existing fact, accompanied by a promise or statement as to a future act. The fact that a present intention of a person not to comply with his promises or statements as to a future act accompanied a false statement as to a past or existing fact does not render the latter statement ineffective to show his commission of the crime of obtaining property under false pretenses." [8]

And Iowa so holds. State v. Montgomery, 56 Iowa 195, 9 N.W. 120; State v. Fooks, 65 Iowa 196, 452, 21 N.W. 561, 773; State v. Tripp, 113 Iowa 698, 84 N.W. 546, 547; State v. Hollingsworth, 132 Iowa 471, 109 N.W. 1003, 1004; State v. Seligman, 127 Iowa 415, 103 N.W. 357; State v. Carter, 112 Iowa 15, 83 N.W. 715. Suggestively, the following excerpt is taken from the frequently cited State v. Fooks, supra:

"The indictment charges that defendant, by false and fraudulent representations as to his property and income, induced one Cowham to loan and advance to him certain sums of money. Among other fraudulent representations, it is alleged in the indictment that defendant represented that his brother was soon to arrive in Iowa Falls, and bring with him money for defendant. The evidence supports this allegation, and shows that defendant stated that his brother was an English nobleman. Counsel for defendant insist that the allegation is immaterial, and evidence in its support was erroneously admitted, for the reason that it pertained to a matter in the future, and not to a present or past event. We think the representation that his brother was to arrive with money, coupled with a promise to use it

in payment of the sums borrowed, amounted to a pretense that he had the money. This pretense was properly alleged and proved."

With obvious relation to the foregoing authorities, defendant cites State v. Comes, 245 Iowa 485, 62 N.W.2d 753, 755, 756, in which the Supreme Court of Iowa declined to apply the rule just advanced to the special facts of that case. That citation is offered in apparent disparagement of the rule itself. But the trial judge in this litigation was under no obligation to agree with that view. The citation was transparently limited to the facts presented in it, and did not repudiate the rule itself.

In passing, however, it is observed that State v. Comes, supra, is authority for two significant propositions. One is that the false pretenses required to support a conviction of crime need not be such as to deceive a prudent and intelligent man, "the law will afford protection to the dull, stupid, confiding, and imbecile against the acts of a cheat," (citing State v. Fooks, supra). This thought is offered in relation to the possibility that Adam Wies be concluded to have been at least naive. The other of those propositions, presently relevant, is that proof of intent to deceive may be made by circumstantial evidence. In the latter behalf, see also In re Aldridge (D.C.N.Y.) 168 F. 93.

Here again, this court does not itself find the facts or announce the conclusions of law. It rather reviews the rulings of the trial court, under the limitations already recalled. And, so doing, it finds them in the present relation unexceptionable.

Further and special discussion need not be offered herein touching defendant's criticism of the trial court's view that the conversation between Wies and Dick at the bank "was not sufficient to cause Adam Wies to doubt that the checks were good when he received them." Passing over the impact *vel non* of the occurrence of doubt, the subject was one for determination by the trial judge. And his

8. See footnote to 168 A.L.R., on page 8.

view was not factually unsupported or clearly erroneous.

Finally, in several specifications, defendant assails the trial judge's finding that the transaction disclosed in the evidence did not constitute a "loan made by or obtained from the Insured," and, therefore, the loss was not "the complete or partial nonpayment of, or default upon, any loan" so made or obtained, and was not within the exclusion of section 1(d) of the bond, as copied in the Affirmative Defense, supra. Judge Hanson's findings and conclusions in that behalf appear in sections (9) (except its first paragraph) (10) and (11) of his opinion, and appear on pages 410, 411 and 412 of Volume 225 F.Supp. They will not and need not be repeated here in detail.

■ Defendant asserts in relation to the issue of the status of the transaction as a loan that special stress should be placed upon the word "any," preceding the word "loan," in the exclusionary specification. In the sense that the word "any" in its context forbids the distinction of one type of loan from another, the point is well taken. But it has no other significance here. The use of the word "any" is inadequate, by any type of verbal alchemy, to transmute into a "loan" a transaction which, but for it, would not be a loan. To obtain the blessing of exclusion the defendant has, despite the presence of the word "any," to show that we are dealing with a loan.

The defendant, then professes to find "error in rejecting the opinion testimony of appellant's expert witnesses." But as appears from the trial court's opinion, that court did not really "reject" the expert testimony of the three bankers so offered by the defendant as expert witnesses. It did observe that the hypothetical question propounded to each such witness contained suppositions, which, therefore, were implicit in the answers to the question, which the court regarded as unfounded, and that, on that account, the value of defendant's expert testimony

was greatly reduced in value. Yet, the court analyzed that expert testimony, and evaluated it fairly and impartially, as this court believes.

The trial court also defined in detail the ingredients of a loan as reflected in the opinion cited on pages 411 and 412 of volume 225 F.Supp. Concededly, and even by the testimony of the defendant's banking experts, the transaction involved was not a normal loan. The trial court disclosed the basic elements of a "loan," and those of a "check transaction," and declared its conclusions that "the transaction in the case was not a loan and thus the transaction is not a risk that was exempted from coverage under the loan exclusion clause."

Supportive of the view of the trial judge that the transaction of October 13, 1960 did not constitute the making by the plaintiff to Paul Dick of a loan are now cited: Hartford Accident and Indemnity Company v. Federal Deposit Insurance Corporation (8 Cir.) 204 F.2d 933, 936; Fidelity and Casualty Company of New York v. Bank of Altenberg (8 Cir.) 216 F.2d 294, 304; and United States, for the use of First Continental National Bank and Trust Company v. Western Contracting Corporation (8 Cir.) 341 F.2d 383.[9]

Admittedly not controlling, yet not wholly unworthy of consideration, is a further circumstance clearly disclosed in the record, but not significantly discussed in the present submission. The plaintiff bank is a small institution. That is so far true that its maximum allowable single loan is $10,000.00. If it be held herein to have made a loan to Paul Dick, the amount of such loan would be three and one-half times the lawful limit for the bank. The public records unquestionably disclose the occasional violation of the legal provision now adverted to. But it is a step not lightly to be taken by any bank, a fact which may be regarded when one is called upon to say whether in a given case it has actually been taken.

9. Concerning which see, by way of supplementation, Volume 25A Words and Phrases, pp. 78 to 113, both inclusive, title LOAN.

It would serve no purpose, but would needlessly expand this opinion, essentially to repeat Judge Hanson's reasoning as between the alternatives of a "loan" and a "check transaction;" to reiterate the details of the occurrence in suit, and to balance them as between the essential elements of a loan on the one hand, and a check transaction on the other. It is sufficient to declare that he gave careful and exhaustive attention to the problem before him, and reached and announced a conclusion upon it, which is not only permissible, but as we think inescapably correct.

We consider that the record and judgment herein are free from error. The judgment is, therefore,

Affirmed.