UNITED STATES for the Use of PLAN-ET CORPORATION, a Michigan Corporation, Appellant,

v.

MacDONALD CONSTRUCTION COMPA-NY, a Missouri Corporation, and The Travelers Indemnity Company, a Connecticut Corporation, Appellees.

No. 19500.

United States Court of Appeals Eighth Circuit.

Oct. 21, 1969.

688

Kenneth Laing, Jr., of MacLean, Seaman & Laing, Lansing, Mich., for appellant; Terrence L. Croft, of Coburn, Croft, Kohn & Herzog, St. Louis, Mo., on the brief.

Ralph C. Kleinschmidt, of Evans & Dixon, St. Louis, Mo., for appellee Travelers Indemnity Co.

William C. Dale, Jr., of Biggs, Hensley, Curtis & Biggs, St. Louis, Mo., for appellee MacDonald Const. Co.

Before MATTHES, GIBSON and BRIGHT, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

This is an appeal in a Miller Act (40 U.S.C. § 270b) case by the plaintiff Planet Corporation against defendants MacDonald Construction Company and The Travelers Indemnity Company. MacDonald was the prime contractor for the United States for the construction of the monumental Gateway Arch in St. Louis, Missouri. Travelers was surety for MacDonald. Planet subcontracted with MacDonald to perform all of the work required in Section 10 of the Specifications of the prime contract with the United States.

The dispute centers on electrical installations, wirings and controls that Planet claims were furnished by it over and beyond the requirements of its subcontract with MacDonald. An amended claim is made for $88,000. The case was tried to the Court,[1] The Honorable James H. Meredith, who in an unreported decision held the subcontract was unambiguous and denied any extra compensation to Planet, and entered judgment accordingly. Planet filed a timely appeal. We affirm.

Since a resolution of the issues raised in this case depends upon an interpretation and construction of the subcontract and related contracts, it is necessary to set out at length the factual situation.

Planet for a consideration of $725,700 subcontracted with MacDonald in August 1962 to complete all of the work required by Section 10 of the prime contract. Section 10 covered the furnishing and installation of the passenger-conveyance trains for the Arch. The passenger-conveyance trains consisted of two trains of eight cars or capsules each, with five passenger seats in each capsule. One train ran in each leg of the Arch from the base of the Arch to the observation area at the top of the Arch, a distance of some 700 feet. Each train has terminals at both the bottom and top of the Arch. Each terminal has eight entrance doors, one for each capsule, which in turn has an electrically operated capsule door. The trains operate electrically by means of cables and hoist motors and all doors, door operating mechanisms, speed and safety mechanisms, switching, starting, stopping, leveling and power mechanisms operate by electricity as do all train components throughout the full distance of the trains' run. Control connections are made with the components of the system throughout the entire traverse of the trains' run.

1. Count Three of Planet's Amended Complaint was not tried at this trial and was held for a later hearing but proper steps were taken to finalize for appeal the judgment we are now considering.

The subcontract provided in Article 1:

"(A) General

"It is the intent of this Sub-Contract that the subcontractor complete all work required by that section of Contract Specifications entitled 'Section 10—Passenger Conveyances—trains' and/or as shown on the contract drawings, as said drawings refer to Passenger Conveyances trains.

"(B) Subcontractors Responsibility

" 1) Subcontractor shall furnish all labor, material, hoisting facilities and/or equipment required to install complete all of the work described in A above.

" 2) This Sub-Contract shall include any and all electrical work required to complete the installation of the passenger train system in complete accordance with the intent of the contract plans and specifications."

The plans and specifications for the construction project were made part of the subcontract and Section 10 of the Specifications provided that the work under Section 10 should conform with referenced requirements of the Standard Elevator and Electric Dumbwaiter Specifications of the General Service Administration (SEEDS).

Paragraph 10–1.1 of Section 10 required the train contractor (Planet) to furnish materials, labor and equipment, and perform "all operations and services required to furnish, fabricate, deliver, install, complete, and test, adjust, place in first class acceptable operating condition" the two passenger trains.

Paragraph 10–4.4 provides that the electrical feeders and wiring shall be as specified in Article 2 of SEEDS. Paragraph 2–1 of Article 2 of SEEDS provides:

"Unless otherwise specified the electric feeders for elevator [2] power service and elevator signal service will be terminated at the elevator controller and signal panels in the elevator machine room and the electric feeder for car lighting service will be terminated at a junction box located in hoistway near midpoint of travel, all as indicated in the project drawings or specified in project specifications. The contractor shall extend wiring from these points to all points of the elevator equipment as required."

Another pertinent provision of SEEDS is paragraph 2–6:

"Conductors—The Contractor [Planet] shall furnish and install all wires and cables necessary for the proper connection and operation of all equipment installed under the elevator contract. * * *."

Also involved in a consideration of Planet's claim is Section 12 of the prime contract. The performance of Section 12 of the prime contract was subcontracted to a third party, Sachs Electric, and admittedly Planet has no responsibility under that Section. Under Section 12–4.2 relating to Elevator and Train Wiring, the contractor (Sachs Electric),

" * * * shall extend the 460-volt 3-phase 3-wire power service to the Machine Room of each elevator and train, install a circuit breaker disconnect and run the power wiring to and connect to the control panels. All wiring, controls and equipment from this point on will be furnished and installed under sections 9 and 10 of the Specification. * * *." [3]

And under the provisions of 12–1.1d contractor Sachs Electric was to provide "Installation of power wiring and con-

---

2. It should be noted that by a provision in the subcontract all references in SEEDS to "elevator" would include "trains".

3. We are not here concerned with Section 9 and admittedly any of the electrical wiring and installation not contained in Section 12 would fall in Section 10 of the Specifications.

trol wiring for all power requirements including elevators and trains."

The District Court in its findings of fact and conclusions of law defined the disputed wiring as "the wiring necessary to operate and run the train extending from the control panels installed by Planet at the top to the control panels at the bottom of the Arch of each train." Planet agrees with this definition of the disputed wiring and contends this is precisely the wiring which falls within the ambit of Section 12 rather than Section 10. MacDonald on the other hand contends that the court's description was not intended to be inclusive or precise but descriptive only and that Planet has not undertaken to point out with particularity the actual items for which it is claiming extra compensation but is dealing with the subject matter of the suit in generalities, referring to it as interzone wiring or field wiring. One of Planet's witnesses, however, Robert C. Beal, Planet's project engineer, has described the disputed wiring as anything from a panel to another source and insists this was outside Planet's subcontract. He characterized the disputed wiring as interzone wiring, wiring connecting component parts of the train system, wiring from door operating mechanisms to the supervisory panel, wires between switches and panels, wiring of limit switches and door operators and between the upper and lower stations of the trains, wires from starter panels to other component parts, and the wiring connecting component parts of the trains' system and switches. The testimony of Beal is at variance with Planet's contractual obligation under Article 1–B–2 of its subcontract to do "any and all electrical work required to complete" the train system. Concededly the train could not operate without the field and interzone wiring outlined by Beal.

Admittedly Planet in its subcontract was required to complete all work and furnish all materials and equipment required under Section 10 for the passenger-conveyance trains. Under Article 1(B) (1) of the subcontract this included "all labor, material, hoisting facilities and/or equipment required to install complete all of the" work required by Section 10; and under 1(B) (2) the "Subcontract shall include any and all electrical work required to complete the installation of the passenger train system in complete accordance with the intent of the contract plans and specifications." Beal admitted on cross-examination that the disputed wiring did include wiring for the train system and admitted that "We [Planet] are suing for wires and cables included in parts of Section 10" and also admitted that his selection of the disputed wiring was contrary to the requirements of specific paragraphs of SEEDS.

Planet reads Section 12–4.2 of the Specifications as requiring the other contractor Sachs to run the power wiring to the control panels and it would then view it as Sach's responsibility to run the wiring and other controls from the panels at the base of the Arch to the panels at the top of the Arch; whereas Sachs and MacDonald view Sachs' obligation under Section 12–4.2 as running the power wiring only to a control panel at the base of each leg of the Arch. Sachs Electric actually did much of the disputed work for which Planet is now suing but did so at the request and direction of Planet.[4] Sam Riezman, vice president of Sachs, testified that all of the work done for Planet, including all of the disputed wiring, was work under Section 10 of the Specifications and not Section 12.

Beal, Planet's project engineer, admitted on cross-examination that substantially all of the disputed wiring operation

---

4. While Planet was performing its subcontract in 1965 it indicated to MacDonald that it did not consider it was required to do some of the train system wiring. MacDonald did not agree and after sev-eral conferences on the matter, Planet agreed to proceed with the work without prejudice to its claim that such work was beyond its subcontract for which it was entitled to additional compensation.

was literally covered by the language of Section 10 and the applicable SEEDS references and was not Section 12 work. Section 12 of the subcontract did not incorporate any reference to SEEDS. Beal attempted to justify his contention, however, that the disputed wiring was not required under Section 10 by the fact that there were no contract drawings showing such wiring. However, Planet itself by the express terms of the contract reference to SEEDS paragraph 2–15 was to prepare "complete * * * field wiring diagrams and straight line diagrams showing the electrical connections, functions and sequence of operation of all apparatus connected with the elevator (including door operators) both in machine room and in hoistway * * *"; and under Specifications paragraph 10–2.12 was obligated to furnish "two sets of wiring diagrams showing complete wiring of controllers, and schematic wiring of complete installations, with all devices properly identified by name, numeral or letter."

■ Since all of the disputed wiring appears not only to literally fall within the pertinent provisions of Planet's subcontract, including the reference to SEEDS, and also since that same conclusion appears from a reasonable reading of the provisions of Planet's subcontract, it appears that under Section 12 the electrical contractor Sachs was required only to bring in the power wiring from the outside source to the control panels at the base of each leg of the Arch and all wiring, controls, equipment and labor from that point on would fall within the obligation of the Section 10 subcontractor Planet.

Clearly Planet has not sustained its heavy burden in order to obtain a reversal on appeal on the factual finding of the trial court. Under American Indemnity Company v. Swartz, 250 F.2d 532, 536 (8th Cir. 1957), "The burden is upon the appellant to demonstrate error. To obtain a reversal the appellant must show that the conclusion reached by the trial court as to the interpretation of the contract is irrational, illogical, unsound, or

contrary to any local or general law applicable to the interpretation * * *." Planet has not only failed to point out where the trial court erred but it appears to us that the trial court was eminently correct in interpreting the contracts in issue and in giving to each its plain, reasonable, and ordinary meaning and then harmonizing the various provisions in light of the plainly expressed purpose and intent of the contracts. Here the plain language of the contract controls. Indemnity Insurance Company v. Pioneer Valley Savings Bank, 343 F.2d 634, 646 (8th Cir. 1965).

Planet's subcontract is not ambiguous and the principles set forth in Sun Oil Company v. Vickers Refining Company, Inc., 414 F.2d 383 (8th Cir. Aug. 5, 1969) are clearly applicable:

"A contract is ambiguous if reasonably susceptible of more than one construction, and the question of whether an ambiguity exists is a matter of law for the court. Eastmount Constr. Co. v. Transport Mfg. Equip. Co., 301 F.2d 34, 41 (8th Cir. 1962); Minnesota Amusement Co. v. Larkin, 299 F.2d 142, 145 (8th Cir. 1962); Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248, 250–251 (7th Cir. 1948), cert. denied, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949). In determining whether there is an ambiguity, it is proper to examine the disputed language in the context of the entire agreement. United States for Use of Bachman & Keffer Construction Company v. H. G. Cozad Constr. Co., 324 F.2d 617 (10th Cir. 1963); Harrison Sheet Steel Co. v. Morgan, 268 F.2d 538 (8th Cir. 1959); Sterneck v. Equitable Life Ins. Co., 237 F.2d 626 (8th Cir. 1956). And evidence relating to prior negotiations and other circumstances surrounding the making of the contract are to be considered in determining whether the contract is ambiguous. Restatement of Contracts, §§ 230, 242."

■■ Planet also contends that the trial court erred in admitting into evi-

692

dence a letter from Planet to MacDonald requesting a novation in the subcontract bid by changing from the bid amount to "an F.O.B. basis with MacDonald assuming the erection and field wiring" and admitting that it had underbid the contract. MacDonald refused to do this. Planet views the letter as having a great influence on the trial court since from it the court concluded that Planet knew it was to do the disputed wiring and Planet further contends that the letter has no relevancy and was not competent on the disputed issues. The letter does appear to have relevancy and is certainly competent as evidence contradicting Planet's contention. Moreover, the letter was admitted without objection and Planet is in no position to raise this point on appeal. Rule 46, Fed.R.Civ.P.; Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46, 55–56 (8th Cir. 1958). Also the factual finding that Planet views as being based on this letter is certainly not clearly erroneous as indicated above and thus cannot be challenged under Rule 52(a), Fed.R.Civ.P.

Judgment affirmed.